William Aldrich et al., Appellants, v Lucille Pattison et al., Respondents.

Second Department, March 4, 1985

### APPEARANCES OF COUNSEL

*Robert M. Lustberg* and *Joan M. Ferretti* for appellants.

*Chadbourne, Parke, Whiteside & Wolff* (*William M. Bradner, Jr., David L. Snyder* and *Peter H. Levitt* of counsel), for respondents.

### OPINION OF THE COURT

RUBIN, J.

The question on this appeal is whether there has been compliance with the procedural and substantive requirements of the State Environmental Quality Review Act (ECL, art 8) (hereinafter SEQRA) and the applicable regulations in the formulation and approval of a final environmental impact statement (hereinafter FEIS).

#### THE RESOURCE RECOVERY PROJECT

The FEIS challenged by petitioners in the instant proceeding concerns the construction of a proposed resource recovery facility (hereinafter facility) in the Town of Poughkeepsie in Dutchess County. Resource recovery is broadly defined in the FEIS as the "recovery of waste materials for use in a productive manner". The proposed facility approved by the Dutchess County Legislature will utilize the technology known as "mass burning", whereby refuse is incinerated at high temperatures in the condition ,it is delivered without prior processing, other than screening to eliminate materials defined as "[u]nacceptable [w]astes".[1] The facility will recover energy from the hot gases

---

1. "Unacceptable Waste" is defined by the FEIS, as follows: "Explosives,

produced by the combustion process in the form of steam, most of which will be sold to the IBM Corporation for use in its South Road Complex. The remainder of the steam will be used to generate electricity for sale to the Central Hudson Gas & Electric Corporation. The residue from the incinerated refuse will be quenched with waste water from the facility's boilers and then deposited at a sanitary landfill located in the Town of Fishkill.

The proposed site for the facility is an 11.5-acre parcel of land on the east bank of the Hudson River, which is to be acquired by Dutchess County from New York Trap Rock, Inc. The site is bordered on the west by a railroad right-of-way and, beyond that, by the Hudson River. Immediately to the north of the proposed facility site is the Arlington Sewer District Sewage Treatment Plant. The IBM South Road Complex, which will be the major consumer of the steam produced by the facility, is located north of the sewage plant. The facility site is bordered on the east by Sand Dock Road. Located approximately 1,500 feet east of Sand Dock Road is the closest residential subdivision in the immediate vicinity. According to the plan for construction of the proposed facility, a 37-acre wooded tract of land between Sand Dock Road and this residential area is also to be purchased by the county from New York Trap Rock, Inc., to serve as a buffer zone. South of the facility site is approximately 325 acres owned and used by New York Trap Rock, Inc., for quarrying rock.

The concept of resource recovery has been under study by Dutchess County since 1972 as an alternative to sanitary landfills, the current method employed by the county for disposing of the majority of its solid waste. The county attempted to implement a proposal for the construction of a resource recovery facility using technology other than "mass burning" in the wake of the 1973-1974 energy crisis, but this project was subsequently abandoned in or about 1975. The groundwork for the present facility was laid in 1980 when the Dutchess County Resource Recovery Task Force, which had been in existence since the mid-1970's, recommended the construction of a resource recovery

---

pathological and biological wastes, radioactive materials; ashes; foundry sand; sanitary sewage and other highly diluted water-carried materials or substances; sewage sludge and septic and cesspool pumpouts; human remains; motor vehicles, including such major motor vehicle parts as transmissions, rear ends, springs, and fenders; agricultural and farm machinery and equipment; liquid wastes; nonburnable construction material and/or demolition debris; and hazardous waste of any kind or nature, such as cleaning fluids, crank case oils, cutting oils, paints, acids, caustics, poisons, drugs; or other materials that would be likely to pose a threat to health or public safety, or cause injury to or adversely affect the operation of the Facility".

facility using the "mass burning" technology. In 1981, the county employed a contractor to perform a study to implement plans for a resource recovery facility. This initial study, completed in September 1981, recommended the construction of a "mass burning" plant capable of incinerating 400 tons of refuse per day to be located at the present proposed site, which was found to be superior to the other sites investigated from an environmental topographic, access, economic and aesthetic point of view. In 1982, the New York State Legislature passed legislation creating the Dutchess County Resource Recovery Agency, a public benefit corporation which will ultimately assume responsibility for the facility at issue in the instant proceeding (L 1982, ch 675). In the same year the county solicited proposals to develop, construct, test and operate a resource recovery facility utilizing the "mass burning" technology.

### THE ENVIRONMENTAL IMPACT STATEMENT

The Dutchess County Department of Solid Waste Management (hereinafter Department of Solid Waste Management) was designated as the "lead agency" for the purposes of this project pursuant to SEQRA (ECL 8-0101 *et seq.*). It retained the contractor which had conducted the initial study for the resource recovery facility to prepare a draft environmental impact statement (hereinafter DEIS), in accordance with the requirements of SEQRA and the applicable regulations (*see,* ECL 8-0109 [4]; 6 NYCRR 617.8). The DEIS was completed on or about January 7, 1983 and, shortly thereafter, copies were distributed and made available to the public at the county's government offices, the clerk's office of each of the municipalities in the county and at several public libraries. A public hearing was held on February 23, 1983 for the purpose of receiving comments on the DEIS, after notices of the hearing were published in local newspapers. Thirty-eight individuals testified at this hearing. In addition, written comments on the DEIS were accepted until March 7, 1983, including those submitted by the New York State Department of Environmental Conservation (hereinafter NYSDEC), local municipalities, other government agencies, and various nonprofit organizations and individuals. None of the individual petitioners submitted either oral or written comments on the DEIS. However, some members of petitioner South Road Civic Association appeared at the public hearing and voiced comments about the proposed facility. Thereafter, a FEIS was prepared, incorporating the comments received on the DEIS and the responses thereto. The FEIS was filed on May 6, 1983 and made available to the public in order to afford interested parties

a further opportunity to review this complex 500-page document, pursuant to 6 NYCRR 617.10.

On May 17, 1983, the lead agency, the Department of Solid Waste Management, issued a statement of findings accepting the FEIS as the basis for proceeding with the resource recovery facility project and certifying that the requirements of SEQRA had been complied with and that the adverse environmental impacts of the project would be mitigated to the maximum extent practicable (*see,* ECL 8-0109 [8]; 6 NYCRR 617.9 [c]). Thereafter, on May 18, 1983, the Dutchess County Legislature passed Resolution 230 in which it approved the FEIS and the findings of the lead agency as the basis to proceed with the construction of the proposed facility.

### THE PROCEEDINGS BEFORE SPECIAL TERM

By notice of petition, dated August 11, 1983, the South Road Civic Association and three individual residents of the subdivision closest to the proposed facility site commenced a proceeding pursuant to CPLR article 78 to review, vacate and set aside Resolution 230 of the Dutchess County Legislature.[2] The petition asserted, *inter alia,* that the FEIS did not comply with the requirements of SEQRA because it failed to adequately address certain issues and adverse environmental impacts of the proposed project. Respondents moved to dismiss the petition, under, *inter alia,* CPLR 3211 (a) (1) and 7804 (f), on the ground the FEIS, when read in light of the applicable regulations and petitioner's own exhibits, was not deficient in any of the respects alleged in the petition. Special Term granted respondents' motion to dismiss the petition, after concluding that the action of the Dutchess County Legislature in passing the resolution approving the proposed project was neither arbitrary nor capricious and was supported by substantial evidence. Special Term found that the FEIS, upon which the Dutchess County Legislature's resolution was based, complied fully with the requirements of SEQRA and the applicable regulations, and that the document "distinctly addressed" each of the areas of concern raised by petitioners.[3]

---

**2.** The proceeding was initially commenced in Westchester County. Subsequently, respondents' motion for a change of venue, transferring the proceeding from Westchester to Dutchess County, was granted.

**3.** Respondents also moved to dismiss the petition pursuant to CPLR 3211 (a) (10), on the ground petitioners had failed to join the Dutchess County Legislature as a necessary party. The decision of Special Term indicated, in dictum, that the Dutchess County Legislature should have been named as a necessary party of the proceeding pursuant to CPLR 1001 (a). The court proceeded, however, to address the merits of the petition in view of the public importance of the issues presented and the absence of any showing of prejudice

## APPLICABLE STANDARD OF JUDICIAL REVIEW

We concur with the result reached by Special Term, but find it necessary to further clarify the judicial standard of review applicable in a case where the agency's compliance with the substantive, as opposed to the procedural, requirements of SEQRA and its implementing regulations is at issue.

## PROCEDURAL COMPLIANCE

SEQRA and its implementing regulations establish a procedural framework designed to incorporate the consideration of environmental factors into the existing planning, review and decision-making process of State, regional and local government agencies at the earliest possible time so as to minimize, to the greatest degree possible, the adverse environmental consequences of any project that is approved (*see,* 6 NYCRR 617.1 [c]; *Matter of Sun Beach Real Estate Dev. Corp. v Anderson,* 98 AD2d 367, *affd* 62 NY2d 965, for reasons stated in opn by Lazer, J., at App Div).

In *Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay* (88 AD2d 484, 486-487), we summarized the procedure as follows: "As early as possible in the SEQRA process, the agency 'having principal responsibility for carrying out or approving' a given project or activity — the 'lead' agency (ECL 8-0111, subd 6) — must determine whether an environmental impact statement (EIS) should be prepared with reference to the proposal submitted (ECL 8-0109, subd 4; 8-0111, subd 6). If the lead agency determines that the project 'may have a significant effect on the environment', either the agency or the applicant — at the latter's option — must prepare a draft environmental impact statement (DEIS) (ECL 8-0109, subds 2, 4). If the draft statement is accepted by the agency 'as satisfactory with respect to scope, content and adequacy', it is then circulated to the DEC, other agencies having an interest in the proposal, and 'interested members of the public' (ECL 8-0109, subds 4, 5; 6 NYCRR 617.8 [b], 617.10). After allowing a period for comment, the lead agency must prepare a final environmental impact statement (FEIS) and circulate it in the same manner as the draft statement (ECL 8-0109, subds 4, 5, 6; 6 NYCRR 617.10 [h]). Finally, upon adoption of the environmental-affecting proposal by the

---

on the part of the named respondents or the Dutchess County Legislature. Special Term indicated that a question existed as to whether a legislative enactment was being challenged, and, therefore, whether the proceeding should be converted into a declaratory judgment action pursuant to CPLR 103 (c), but concluded that it was not necessary to resolve this issue in view of the decision to dismiss the proceeding on the merits.

lead agency, it is required to make explicit findings that (1) the requirements of SEQRA have been met, and (2) adverse environmental effects revealed in the EIS process will be minimized or avoided to the maximum extent possible (ECL 8-0109, subd 8; 6 NYCRR 617.9 [c])".

Since the Legislature has directed that the policies, statutes, regulations and ordinances of the State and its political subdivisions should be interpreted and administered "to the fullest extent possible" in accordance with SEQRA (ECL 8-0103 [6]), we have required literal compliance with the environmental review procedures set forth in SEQRA and the regulations (*see, Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay*, 88 AD2d 484, 490-491, *supra; Matter of Rye Town/King Civic Assn. v Town of Rye*, 82 AD2d 474, *appeals dismissed* 55 NY2d 747; *see also, Matter of Niagara Recycling v Town Bd.*, 83 AD2d 335, 340, *affd* 56 NY2d 859).

There is no question that respondents in the instant proceeding have literally complied with the procedural requirements of SEQRA.

After making an initial determination that the proposed facility "may have a significant effect on the environment" (ECL 8-0109 [2]), the Department of Solid Waste Management, designated as the "lead agency" for the purpose of SEQRA (*see,* ECL 8-0109 [4], [6]), caused a DEIS to be prepared (*see,* ECL 8-0109 [2]; 6 NYCRR 617.10 [c]; 617.14 [f]). The Department of Solid Waste Management accepted the DEIS "as satisfactory with respect to its scope, content and adequacy" (6 NYCRR 617.8 [b]) and then filed the document with the government agencies designated in the regulations and circulated it to other "federal, state, regional and local agencies having an interest in the proposed action and to interested members of the public for comment" (ECL 8-0109 [4]; 6 NYCRR 617.10 [d], [e]). There was a period of about two months allowed for receiving comments on the DEIS from interested government agencies, organizations and members of the public, and a public hearing was held (*see,* ECL 8-0109 [5]; 6 NYCRR 617.10 [f]). In accordance with the requirements of the statute and the regulations, the FEIS contained sections which summarized and responded to the comments received during the public comment period (*see,* ECL 8-0109 [2]; 6 NYCRR 617.14 [h]). The FEIS was filed and made available for public review in the same manner as the DEIS (*see,* ECL 8-0109 [6]; 6 NYCRR 617.10 [g], [h]). Finally, the Department of Solid Waste Management made the requisite findings of fact that (1) the requirements of SEQRA have been met, and (2)

adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided to the maximum extent possible (ECL 8-0109 [8]; 6 NYCRR 617.9 [c]).

SUBSTANTIVE COMPLIANCE

In contrast to the detailed procedural requirements of SEQRA, the statute and regulations contain only general guidelines for the content of a FEIS. According to SEQRA, "[t]he purpose of an environmental impact statement is to provide detailed information about the effect which a proposed action is likely to have on the environment, to list ways in which any adverse effects of such an action might be minimized, and to suggest alternatives to such an action so as to form a basis for a decision whether or not to undertake or approve such action" (ECL 8-0109 [2]). In short, the statute and regulations list general categories of information which must be included and analyzed in an environmental impact statement.

■ When approval of a proposed project is sought to be set aside on the ground that the administrative or legislative governmental body based its determination upon a FEIS which is claimed to be deficient with respect to the scope or lack of coverage devoted to specific environmental concerns, mitigating measures or project alternatives, the judicial standard of review is the "hard look" standard applied in *H.O.M.E.S. v New York State Urban Dev. Corp.* (69 AD2d 222, 232). Reviewing an agency's determination that the proposed project would not have a significant environmental impact sufficient to require the preparation of a FEIS, the court, in *H.O.M.E.S.,* applied the standard developed by the Federal courts in construing the National Environmental Policy Act (NEPA) (*see,* 42 USC § 4321 *et seq.*), the statute upon which SEQRA is modeled. The court held that any agency's negative declaration would pass judicial scrutiny if the record showed that it identified the relevant areas of environmental concern, took a "hard look" at them (*Kleppe v Sierra Club,* 427 US 390, 410, n 21; *Maryland-National Capital Park & Planning Commn. v United States Postal Serv.,* 487 F2d 1029, 1040) and made a "reasoned elaboration" of the basis for its determination (*City of Rochester v United States Postal Serv.,* 541 F2d 967, 973; *H.O.M.E.S. v New York State Urban Dev. Corp., supra,* pp 231-232; *see also, Matter of Cohalan v Carey,* 88 AD2d 77, 81). Recent decisions have applied the "hard look" standard to the judicial review of the substance of a FEIS and the governmental determinations concerning the environmental impact of a proposed project based upon that docu-

ment (*see, Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 491-492, *affd* 60 NY2d 805; *Matter of Environmental Defense Fund v Flacke,* 96 AD2d 862).

In reviewing the content of a FEIS, SEQRA is to be construed in light of the rule of reason (*see, Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215). Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a FEIS will satisfy the substantive requirements of SEQRA (*see, Coalition Against Lincoln W. v City of New York, supra,* p 491; *Matter of Environmental Defense Fund v Flacke, supra*). According to ECL 8-0109 (2), an environmental impact statement should be clearly written in a concise manner capable of being read and understood by the public, should deal with specific *significant* environmental impacts which can be reasonably anticipated and should not contain more detail than is appropriate considering the nature and magnitude of the proposed action and the significance of its potential impacts (*see also,* 6 NYCRR 617.4 [c]). The degree of detail with which each factor must be discussed will vary, of course, with the circumstances and nature of each proposal (*Webster Assoc. v Town of Webster,* 59 NY2d 220, 228; *accord, Life of Land v Brinegar,* 485 F2d 460, 473, *cert denied* 416 US 961). We reiterate that the rule is one of reasonableness and balance (*see, Coalition Against Lincoln W. v City of New York, supra*). This rule is reflected in the regulations which explain that an environmental impact statement should assemble relevant and material facts upon which the decision is to be made, should identify the essential issues to be decided, should evaluate all reasonable alternatives and, on the basis of these, should make recommendations in a manner which is *"analytical and not encyclopedic"* (6 NYCRR 617.14 [b]; emphasis supplied). For example, in *Matter of Environmental Defense Fund v Flacke (supra)* the petitioners contended that the FEIS, prepared with respect to a proposal to convert a power plant from coal-fixed to oil-fixed generation, violated SEQRA by failing to address feasible alternatives. Despite the fact that the FEIS did not specifically address the alternative advanced by the Environmental Defense Fund, this court held that the FEIS considered reasonable alternatives in accordance with the requirements of SEQRA (*see,* ECL 8-0109 [2]; 6 NYCRR 617.14 [f] [5]), because the document analyzed a continuum of options with respect to the sulfur content of the coal to be burned and the devices to remove the sulfur dioxide from the gases emitted by the plant, some of which were similar to the Environmental Defense Fund's proposal.

Contrary to petitioners' contention, the "hard look" standard does not authorize the court to conduct a detailed de novo analysis of every environmental impact of, or alternative to, a proposed project which was included in, or omitted from, a FEIS.

SEQRA allows an administrative agency or governmental body considerable latitude in evaluating the environmental impacts and alternatives discussed in an environmental impact statement to reach a determination concerning a proposed project. "While an [environmental impact statement] does not require a public agency to act in any particular manner, it constitutes evidence which must be considered by the public agency along with other evidence which may be presented to such agency * * * Thus the general substantive policy of the act is a flexible one. It leaves room for a responsible exercise of discretion and does not require particular substantive results in particular problematic instances" (*Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215, 222, *supra,* cited with approval in *Coalition Against Lincoln W. v City of New York, supra,* p 492; *see also, Grazing Fields Farm v Goldschmidt,* 626 F2d 1068, 1072).

■ In reviewing an agency's determination on environmental matters, this court has held that the familiar standard of review for proceedings pursuant to CPLR article 78 is applicable. Thus, the court may only annul a determination as to the sufficiency of an environmental impact statement and the environmental consequences of the proposed project "if it is not rational — if it is arbitrary and capricious or unsupported by substantial evidence" (*Town of Hempstead v Flacke,* 82 AD2d 183, 187; *see, Matter of Pell v Board of Educ.,* 34 NY2d 222; *Matter of Environmental Defense Fund v Flacke,* 96 AD2d 862, *supra*). An analogous standard has been applied to review the substantive aspects of administrative agency determinations on environmental matters pursuant to NEPA (*see, Grazing Fields Farm v Goldschmidt,* 626 F2d 1068, 1071-1072, *supra*). A flexible standard of review, allowing considerable latitude for the exercise of discretion by the responsible administrative agency or governmental body, is particularly appropriate for the assessment of the environmental consequences of a project, which frequently involves technical and scientific issues more properly entrusted to the expertise of an agency, rather than to a court of general jurisdiction.

### DOCTRINE OF EXHAUSTION OF ADMINISTRATIVE REMEDIES

Applying the doctrine of exhaustion of administrative remedies, courts have refused to review a determination on environ-

mental matters based upon evidence or arguments not presented during the proceeding before the lead agency (*see, Matter of Town of Candor v Flacke,* 82 AD2d 951, 952; *Natural Resources Defense Council v City of New York,* 112 Misc 2d 106, 108). "The doctrine of exhaustion of administrative remedies requires 'litigants to address their complaints initially to administrative tribunals, rather than to the courts, and * * * to exhaust all possibilities of obtaining relief through administrative channels before appealing to the courts' (2 Cooper, State Administrative Law, p 561). It is bottomed on the principle that '[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action' (*Unemployment Comm. v Aragon,* 329 US 143, 155; see, also, 3 Davis, Administrative Law, § 20.06)" (*Young Men's Christian Assn. v Rochester Pure Waters Dist.,* 37 NY2d 371, 375; *see also, Matter of Yonkers Gardens Co. v State of New York Div. of Housing & Community Renewal,* 51 NY2d 966, 967-968; *Watergate II Apts. v Buffalo Sewer Auth.,* 46 NY2d 52, 57). Where environmental matters are involved, as in the instant proceeding, it is particularly important to allow the administrative agency possessing the requisite expertise to exercise its authority to hear the evidence on the issues, make findings and state the reasons for its action on the record prior to judicial review of the determination. Consequently, an application for judicial review of the substance of a FEIS should be based upon evidence refuting the analysis and conclusions contained therein which the lead agency had an opportunity to consider in the first instance. This evidence may include the testimony of witnesses, particularly persons with expertise related to the matters at issue, or documentary evidence, including relevant scientific studies.

■ At bar, petitioners have improperly raised, for the first time in their CPLR article 78 petition, three objections to the sufficiency of the FEIS which were never voiced by members of petitioner South Road Civic Association or by any other individuals or organizations during the administrative proceedings conducted by the Department of Solid Waste Management prior to its approval of the FEIS. Petitioners argue that the FEIS did not adequately address (1) the impact of the facility on the alleged "wetlands" located at the proposed site, including the applicability of the permit requirement of the Federal Clean Water Act (33 USC § 1251 *et seq.*), (2) the potential adverse environmental impacts of waste water discharged by the facility

into the nearby sewage treatment plant and (3) the future plans for the codisposal of sewage sludge along with the solid refuse presently planned to be incinerated at the facility. Having failed to comment upon these issues at the public hearing or during the period for submitting written comments, these issues are not now properly before this court for review (*Matter of Town of Candor v Flacke,* 82 AD2d 951, *supra; Matter of Malkin v Tully,* 65 AD2d 228, 230). Nevertheless, we have reviewed these issues, along with the other alleged deficiencies, and conclude, for the reasons discussed *infra,* that the FEIS addressed each issue in a degree of detail which we find to be "appropriate considering the nature and magnitude of the proposed action and the significance of its potential impacts" (ECL 8-0109 [2]). Moreover, aside from conclusory assertions, petitioners have failed to present sufficient evidence concerning issues which they assert were omitted from that document or not discussed in sufficient detail by it (*see, Matter of Town of Candor v Flacke, supra*).

OBJECTIONS TO THE FEIS

A. *Environmental Impacts*

1. *Air Quality*

According to the FEIS, the "most significant potential long-term environmental impact of the facility will be on air quality", due to the discharge of pollutants from the combustion of the solid wastes. The FEIS noted that the design of the facility will include features to minimize the discharge of air pollutants, including electrostatic precipitators to remove particulate matter, high combustion temperatures which are expected to reduce emissions of hazardous organic compounds and a 200-foot stack to maximize the dispersion of emissions from the plant. Based upon detailed analyses of the pollutants which would be discharged by the facility, using a computer model approved by the NYSDEC, the FEIS concluded that the emissions would be well within the applicable air quality standards.

Petitioners contend that the computer model did not furnish an accurate measurement of the facility's impact on local air quality because the surface weather, mixing height and atmospheric stability data used in the model, did not reflect the unique microclimate of the banks of the Hudson River where the facility is to be located. Petitioners have failed to sustain their burden with respect to this issue.

The data on atmospheric stability was obtained at the Dutchess County Airport. In response to petitioners' comments about the accuracy of the data used in the computer model, which

comments were belatedly made after the FEIS was approved by the lead agency and the County Legislature, the NYSDEC explained that the method for obtaining data on atmospheric stability at the Dutchess County Airport was more acceptable to the United States Environmental Protection Agency (EPA) than the method employed by the alternative study favored by petitioners. Also, the surface weather data was obtained from the Roseton Power Plant, which is located on the banks of the Hudson River, 8.9 kilometers south-southwest of the proposed facility site. Except for the mixing height data supplied on tape by the Albany National Weather Service Station, all the other numerous meteorological data used in the computer model to predict the impact of the facility on air quality in the surrounding area was obtained from the general vicinity of the proposed site, including the background data on air quality taken from the NYSDEC monitoring station in the nearby City of Poughkeepsie. Under these circumstances, we should not substitute our judgment concerning the appropriateness of the data used in the computer model for that of NYSDEC, the experts who prepared the FEIS, or the lead agency and the County Legislature which approved it. Petitioners' comments cannot merely state that a particular mistake was made; it must show why the mistake was of possible significance in the results before an agency's determination can be vacated (*see, Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council*, 435 US 519, 553-554).

## 2. *Wetlands*

Petitioners contend that the FEIS failed to consider the adverse environmental impact of the proposed facility on the "wetlands" allegedly located on the proposed site (a one-acre stagnant pond and a two- to three-acre wet meadow) and the need to obtain a permit, pursuant to the Federal Clean Water Act § 404 (a) (33 USC § 1344 [a]) "for the discharge of dredged or fill material into the navigable waters at specified disposal sites."

The section of the FEIS which analyzed the impact of the proposed facility on the vegetation and wildlife in the area specifically indicated that a "small pond of stagnant water" would have to be drained in order to construct the resource recovery facility. Based upon a survey of the proposed site by a naturalist, the document concluded that the draining of this body of water would have no significant adverse impact on the environment, as the pond in question was not used by local

wildlife and the area contained no rare, endangered or threatened species. Any adverse impact on the natural environment resulting from the construction of the facility would be mitigated by the preservation of a 37-acre buffer zone between the facility site and the residential subdivision where petitioners live. This land would be left undisturbed to maintain intact the habitat for wildlife. The FEIS noted that a seasonal marsh created by a seasonally flowing stream and located in the northwestern portion of the buffer area would be preserved because it formed a valuable habitat for reptiles during the spawning season when the area is wet.

There was no evidence presented during the administrative proceeding and prior approval of the FEIS that the one-acre stagnant pond or the two- to three-acre wet meadow located on the facility site are wetlands protected under either State or Federal law.

Whenever new information is disclosed to the lead agency prior to approval of the FEIS and the project, it must determine whether a supplemental impact statement is required based on the probative value of the information, its probable accuracy and the present state of information contained in the impact statement (*see, Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484, *supra*).

Assuming, arguendo, that the information concerning wetlands had been timely proffered by petitioners prior to the final approval of the FEIS and the project, rather than in this article 78 proceeding, a supplemental impact statement would not have been warranted based on an evaluation of said information in light of the factors set forth in *Glen Head*.

The naturalist who investigated the proposed site on behalf of both petitioners and the lead agency concluded that the areas at the site which had the ecological characteristics of "wetlands" (*see,* 6 NYCRR 662.1 [*l*]) were not large enough to qualify for protection under the State regulations governing freshwater wetlands, which require that such wetlands "have an area of at least 12.4 acres (approximately 5 hectacres) or, if smaller, have unusual local importance as determined by the commissioner" (*see,* 6 NYCRR 663.2 [*l*]; 6 NYCRR 664.2 [f]; *see also,* 6 NYCRR 662.2 [a]). It is significant that the NYSDEC never raised a wetlands issue when it made comments on the FEIS and the proposed project. The FEIS noted that a consolidated application for all the State permits required to construct and operate the facility had been filed with NYSDEC pursuant to ECL article 70 (6 NYCRR part 621). The comments submitted by NYSDEC

concerning the project did not mention the need for a State freshwater wetlands permit (*see,* ECL 24-0701; 6 NYCRR part 663) or a permit issued pursuant to the Federal Clean Water Act in order to construct the facility at the proposed site.

The location, dimension and ecological nonsignificance of the subject "wetlands" negate the probative value and probable accuracy of petitioners' information that this one-acre pond and the two- to three-acre wet meadow would qualify for protection under the Federal Clean Water Act (33 USC § 1251 *et seq.*) so as to require a dredge and fill permit (33 USC § 1344 [a]). The Federal Clean Water Act § 404 provides that a permit be obtained from the Secretary of the Army for the discharge of dredged or fill material into "navigable waters" (33 USC § 1344 [a]). The term "navigable waters" is defined as "the waters of the United States, including the territorial seas" (33 USC § 1362 [7]). The regulations define, in pertinent part, "waters of the United States" as: "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce" (33 CFR 323.2 [a] [1]), "[a]ll other waters such as intrastate * * * rivers, streams (including intermittent streams) * * * wetlands * * * or natural ponds, *the use, degradation or destruction of which could affect interstate or foreign commerce*" (33 CFR 323.2 [a] [3]; emphasis supplied), and "[w]etlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) (1) through (a) (6) of this section" (33 CFR 323.2 [a] [7]). The regulations further define the term "adjacent" to mean "bordering, contiguous, or neighboring" but go on to state that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes or the like are 'adjacent wetlands' " (33 CFR 323.2 [d]).

The Hudson River, an intrastate, navigable river used for interstate commerce, is obviously a water identified in 33 CFR 323.2 (a) (1), (3). Although the pond and meadow are located in proximity to the Hudson River, it is dubious that these wetlands would be encompassed within the meaning of wetlands adjacent to waters identified in 33 CFR 323.2 (a) (1), (3) as waters of the United States under 33 CFR 323.2 (a) (7) of said regulation. In contrast to wetlands located in low-lying areas subject to periodic inundation by waters from a neighboring, navigable river, which have been found to fall within the definition of adjacent wetlands (*see, Avoyelles Sportsmen's League v Marsh,* 715 F2d 897; *United States v Weisman,* 489 F Supp 1331, 1337), the subject pond and meadow are in a depressed portion of a bench apparently located above the high water mark of the Hudson

River and are admittedly separated from the river by a 30-foot cliff. The Hudson River is not the source of the water which accumulates in the pond or meadow. According to the FEIS, the pond receives storm water runoff from the higher regions of the facility site. Nor are there any facts in the record on appeal from which to infer that the destruction of this one-acre pond or two- to three-acre meadow, which are not the habitat of any rare or endangered aquatic species, "could affect interstate or foreign commerce" so as to constitute "intrastate * * * wetlands", as defined in 33 CFR 323.2 (a) (3). Although the applicability of a dredge and fill permit is to be determined, in the first instance, by the Federal agencies with primary jurisdiction in that area (33 USC § 1344 [b], [d]), petitioners' belated contention that the subject pond and meadow would fall within the meaning of "waters of the United States" is specious.

### 3. *Other Impacts*

The other issues which were not raised during the administrative proceedings prior to the approval of the FEIS concern the adverse environmental impacts of the discharge of waste water from the facility's boilers into the neighboring Arlington Sewer District Sewage Treatment Plant and the plans for the codisposal of sewage sludge in the resource recovery facility at some unspecified date in the future. Petitioners have presented no evidence, however, that the above issues represent sufficiently serious adverse environmental impacts of the facility, as it is currently planned to be built and operated, to warrant more detailed treatment than has already been accorded to them in the FEIS.

## B. *Mitigating Measures*

Petitioners contend that the FEIS did not provide adequate measures to screen hazardous waste from entering the facility. The regulations governing the facility's operation set forth specific categories of waste which the operator is not to accept for incineration because the materials are either noncombustible, can cause damage to the facility or can result in the facility violating its environmental permits, either for stack emissions or for quality of the residue. Hazardous waste is one of the categories of "unacceptable wastes". Measures for screening unacceptable wastes will include systematic inspections by the Dutchess County Resource Recovery Agency of truckloads of refuse entering the facility and by visual inspection of the refuse by the crane operator who transfers the refuse dumped by the garbage trucks into the incineration unit. The unacceptable

waste regulations will be incorporated into the contracts with the haulers responsible for delivering refuse to the facility and violators will be barred from making future deliveries to the facility. Responding to remarks received during the public comment period, it was acknowledged in a section of the FEIS that despite the above measures, toxic organic wastes may be present in small quantities in the refuse processed by the facility. Nevertheless, based on studies conducted by EPA and NYSDEC, the FEIS concluded that the high incineration temperature to which the refuse would be subjected would destroy 99.99% of the toxic organic compounds present therein. Petitioners have proffered no evidence to rebut this conclusion or the studies which serve as its foundation. Therefore, in light of the slight potential of this adverse environmental impact, petitioners' contention that the FEIS did not contain a sufficient analysis of screening measures is specious.

Petitioners also contend that the FEIS did not provide adequate measures to mitigate potential hazards created by liquid leaching, or seeping, from the residue deposited at the landfill.

The FEIS concluded that the residue deposited at the landfill would contain potentially hazardous metallic compounds in amounts well below toxic levels, based upon studies of the residue from similar resource recovery facilities. Once again, petitioners presented no evidence to refute this conclusion, which was adopted, as well, by NYSDEC. The document also concluded that the residue quenched by the waste water from the boiler would contain approximately 20% to 30% moisture, but that this moisture would not have a tendency to leach or seep from the ash after it was deposited at the landfill site. Moreover, the landfill site contains safeguards required by the newest State regulations (*see,* 6 NYCRR part 360), including an impermeable liner below the refuse and a leachate collection pond, which the FEIS concluded were adequate to eliminate any environmental hazards caused by liquid leaching from the residue. The residue will be tested periodically and the groundwater at the landfill site will be monitored for any increases in toxic substances. If the residue generates a more significant amount of leachate with higher concentrations of hazardous compounds than is expected, the FEIS suggested additional measures, including transporting the excess liquid from the landfill site to a sewage treatment plant. Once again petitioners have presented no evidence that the leachate generated by the residue would create a significant environmental hazard to justify a more extensive discussion of mitigative measures.

## C. *Alternatives to the Proposed Site*

Petitioners did not suggest, either during the public comment period or afterwards, any reasonable alternatives to the proposed facility or its location which respondents did not consider in preparing the FEIS (*cf. Matter of Environmental Defense Fund v Flacke,* 96 AD2d 862, *supra*). Rather, petitioners argue that the discussion of alternatives to the proposed action was conclusory and lacked sufficient details concerning the economic or environmental consequences of the options considered.

An entire chapter of the FEIS was devoted solely to an analysis of alternatives to the proposed facility, including other options to solve Dutchess County's solid waste disposal problems, alternative resource recovery technologies and alternative sites for the plant and the sanitary landfill which would receive the residue from the incineration process. We conclude that the discussion of alternatives contained in this chapter satisfied the hard look test as it was "at a level of detail sufficient to permit a comparative assessment of the alternatives discussed" (6 NYCRR 617.14 [f] [5]).

Petitioners have presented no evidence to challenge the conclusion of the FEIS that Dutchess County could not continue to depend upon sanitary landfills for the disposal of the majority of its solid wastes (the "no-action alternative" within the meaning of 6 NYCRR 617.14 [f] [5]). This conclusion was supported by findings that the capacity of the major existing landfills would be exhausted within the next 15 years and that it would become increasingly expensive and impractical to bring existing landfills into compliance with the new regulations (*see,* 6 NYCRR part 360 *et seq.*), to develop new landfills, and to transport solid waste to more distant locations. The seriousness of the solid waste disposal problems faced by Dutchess County is underscored by the fact that alternatives to existing sanitary landfills, including resource recovery, had been under consideration for over 10 years prior to the approval of the proposal to construct the facility in question. The FEIS evaluated the alternative solid waste disposal methods and resource recovery technologies in terms of criteria other than economics, including technological feasibility, based upon past experience with similar facilities or methods in this country and abroad, and compliance with the applicable environmental standards. An important reason that the proposed site for the present facility has been considered by the county since 1975 as a location for a resource recovery plant is its proximity to a large potential customer for the steam and energy to be produced by such a plant, the IBM South Road Complex. The FEIS further indicates that the proposed site was

determined to be superior to the other sites considered based upon additional criteria including the impact on surrounding residential neighborhoods and accessibility to highways for the transportation of waste to the facility and the hauling of the incinerated residue to a sanitary landfill.

The sanitary landfill located in the Town of Fishkill was selected as the site for the disposal of the residue from the incineration process on account of the fact it is located closest to the facility site, as well as the fact that, at the time the FEIS was prepared, it was the only landfill located within Dutchess County which complied with the new regulations (*see,* 6 NYCRR part 360 *et seq.*), which include safeguards to prevent the contamination of the surrounding soil and groundwater by waste materials.

### CONCLUSION

In our opinion, the FEIS passes the test for compliance with the substantive requirements of SEQRA. The document identified and analyzed the relevant areas of environmental concern, including mitigating measures and reasonable alternatives to the proposed project. The degree of detail devoted to the analysis of each issue was appropriate considering the nature and magnitude of the proposed action and the significance of its potential impacts. Such an analysis satisfied the "hard look" requirement imposed by SEQRA (*Matter of Environmental Defense Fund v Flacke,* 96 AD2d 862, *supra; Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484, 492, *supra;* ECL 8-0109 [2]). In accordance with the substantive guidelines in SEQRA and its implementing regulations, the FEIS's basic findings and conclusions with respect to environmental impacts, mitigating measures and project alternatives, were explained in nontechnical language. The technical materials relied upon to prepare the statement were summarized in the body of the document and cited in bibliographic sections at the conclusion of the statement or, where necessary, reproduced in appendices (*see,* 6 NYCRR 617.14 [c]). Here, there was a reasoned elaboration of the basis for each finding and conclusion. As noted by the United States Court of Appeals for the Ninth Circuit, "The [environmental impact] statement need not achieve scientific unanimity on the desirability of proceeding with the proposed action" (*Life of Land v Brinegar,* 485 F2d 460, 473, *supra*). The choice of action is an area within the discretion of the appropriate administrative and legislative body which may not be set aside unless it is not rational, i.e., arbitrary,

capricious or unsupported by substantial evidence (*Town of Hempstead v Flacke,* 82 AD2d 183, *supra; Matter of Pell v Board of Educ.,* 34 NY2d 222, *supra*). In the instant case, the determination of the Department of Waste Management, dated May 17, 1983, to proceed with the implementation of plans to construct a resource recovery facility in the Town of Poughkeepsie and the enactment of Resolution 230 by the Dutchess County Legislature, dated May 18, 1983, implementing such determination were supported by substantial evidence contained in the FEIS, which was prepared in accordance with the procedural and substantive requirements of SEQRA.

Accordingly, the judgment of the Supreme Court, Dutchess County, dismissing the petition should be affirmed.

MOLLEN, P. J., WEINSTEIN and EIBER, JJ., concur.

Judgment of the Supreme Court, Dutchess County, dated October 20, 1983, affirmed, without costs or disbursements.