[646 NYS2d 741]

MOBIL OIL CORPORATION, Petitioner, v CITY OF SYRACUSE INDUSTRIAL DEVELOPMENT AGENCY, Respondent. (Proceeding No. 1.)

Fourth Department, July 12, 1996

## APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle, L. L. P.,* Rochester *(Kevin Reccnia* of counsel), for petitioner.

*Hiscock & Barclay, L. L. P.,* Buffalo *(Mark McNamara* of counsel), for respondent.

## OPINION OF THE COURT

BOEHM, J.

In these original proceedings brought pursuant to EDPL 207 by petitioners Sun Company, Inc. (R & M) (Sun), Atlantic Refining and Marketing Co., Inc. (Atlantic), Citgo Petroleum Corporation (Citgo) and Mobil Oil Corporation (Mobil) (collectively, petitioners), we are again called upon to review the challenges brought by petitioners against the proposed condemnation by respondent, City of Syracuse Industrial Development Agency (SIDA), of parcels of real property owned by petitioners near the south shore of Onondaga Lake in the City of Syracuse, the so-called "Oil City" area. Petitioners'

properties contain bulk petroleum storage and terminal facilities. The proposed taking is for the purpose of developing a retail shopping plaza to be known as Carousel Landing (the project) by the Pyramid Companies (Pyramid), a general partnership. It is unnecessary to detail the facts as this proceeding and a related matter have been before the Court on three previous occasions (*see, Sun Co. v City of Syracuse Indus. Dev. Agency*, 209 AD2d 34, *appeal dismissed* 86 NY2d 776 [*Sun II*]; *Sun Co. v City of Syracuse Indus. Dev. Agency*, 197 AD2d 912; *Mobil Oil Corp. v Syracuse Indus. Dev. Agency*, 152 AD2d 988, *affd* 76 NY2d 428).

In *Sun II*, we upheld as constitutional, both facially and as applied, the statutory condemnation scheme authorizing SIDA to condemn property, and we determined that the proposed condemnation does not violate General Municipal Law § 862, which prohibits Industrial Development Agencies from funding certain projects. We found fault, however, with certain aspects of the environmental review of the project undertaken by SIDA pursuant to ECL article 8 (the State Environmental Quality Review Act [SEQRA]), and we annulled its SEQRA determination and findings.

Thereafter, SIDA, continuing as lead agency, in an effort to remedy the SEQRA deficiencies found in *Sun II*, conducted a supplemental environmental review. It circulated a Supplemental Draft Environmental Impact Statement (SDEIS), held a public hearing on July 20, 1995, scheduled public comment through July 31, 1995, and prepared a Supplemental Final Environmental Impact Statement (SFEIS). On October 12, 1995, SIDA made findings and determined, pursuant to EDPL 204, to condemn petitioners' properties of approximately 55.7 acres for the development of the project.

In the present proceeding, petitioners renew their earlier attacks against the EDPL condemnation process and the General Municipal Law provisions authorizing condemnation by an Industrial Development Agency. Additionally, petitioners now contend that the Preferred Developer Agreement between SIDA and Pyramid improperly restricts SIDA to a course of action favorable to Pyramid; SIDA's SEQRA review of the project is tainted; SIDA impermissibly curtailed the SEQRA process by preparing a supplemental, rather than a new, SEQRA review; SIDA improperly designated itself as lead agency; SIDA improperly introduced substantial new information in its SFEIS; SIDA acted arbitrarily and capriciously in making its findings in its supplemental SEQRA review by failing to

consider specific measures necessary to mitigate traffic impacts, by relying upon undefined future mitigation measures, and, generally, by failing to take the requisite "hard look" at the environmental impacts of the project; and members of the SIDA board repeatedly violated the Open Meetings Law (Public Officers Law §§ 100-111) by meeting privately regarding the project.

# I

█ Reconsideration of the eminent domain issues, which are again being advanced by petitioners, issues that were raised and decided in *Sun II*, and in which reargument was denied, is foreclosed by the doctrines of res judicata, collateral estoppel and law of the case. Once a determination has been made on the merits in a case involving the same parties, that should put an end to the matter (*see, Staatsburg Water Co. v Staatsburg Fire Dist.,* 72 NY2d 147, 152; *Matter of Hodes v Axelrod,* 70 NY2d 364, 372-373; *Martin v City of Cohoes,* 37 NY2d 162, 165, *rearg denied* 37 NY2d 817). Further, "questions of law that have been resolved by an appellate court on a prior appeal will not be reviewed upon a further appeal to that court" (*Matter of Local 345 of Retail Store Empls. Union [Heinrich Motors],* 96 AD2d 182, 186, *revd on other grounds* 63 NY2d 985; *see, Matter of Hubbard v Town of Sand Lake,* 223 AD2d 794; *Matter of Village of Johnson City v Bolas,* 157 AD2d 1009, 1010; *Matter of Acres Stor. Co. v Chu,* 144 AD2d 758, 759, *appeal dismissed* 73 NY2d 914).

We find no basis for the attempts by petitioners to avoid the bar of our prior adjudication by raising distinctions between the earlier 1993 proceeding and the present one. The project is the same as that considered by SIDA in 1993. The SEQRA review at that time similarly considered the extent and purpose of the project, which is now, as it was then, still located in a "highly distressed area", as that term is applied in General Municipal Law § 862 (2) (b) (iii). SIDA's financial condition remains substantially unchanged, and the involvement of the City of Syracuse in the project appears to be the same as it was in 1993. The same Preferred Developer Agreement, even as subsequently amended, violated neither the EDPL nor the General Municipal Law. The amendments to the Agreement did no more than address the concerns expressed in *Sun II*.

We do not share the apprehension expressed again by petitioners that the bond required to be furnished by Pyramid

will not provide a certain and adequate source and manner of payment. In determining the amount of that bond, Supreme Court will take into consideration the appraisals submitted by all of the parties, including those of petitioners, which no doubt will also be prepared. If SIDA does not accept the amount fixed by the court after reviewing all of the appraisals, then, of course, the condemnation will not go forward and petitioners' properties will not be affected. Whether to have a hearing preliminary to determining the amount of the bond is a matter to be decided by the court (*see, Matter of New York State Urban Dev. Corp. [TOH Realty Corp.]*, 165 AD2d 733, *appeal dismissed* 76 NY2d 982, *lv denied* 77 NY2d 810). Nor do we share the concern expressed by petitioners that a bonding company does not provide the same assurance of payment as a municipality. Although, as petitioners argue and illustrate by newspaper articles in exhibits to their briefs, insurance companies have gone bankrupt, we may take judicial notice of the fact that they have historically and satisfactorily met their burden of making good their liabilities as sureties in a multitude of commercial transactions, including construction contracts involving huge potential financial obligations. We would also take judicial notice of the fact that there are also municipalities that for one reason or another became unable to meet their financial obligations.

## II

In *Sun II* we referred to a letter from the Director of the Office of Lakefront Development stating that SIDA was unable to consider other alternatives because it was bound by the Preferred Developer Agreement (PDA). That restriction necessarily precluded meaningful consideration of other alternatives to the proposed project and we held that that represented a failure to comply with SEQRA. That restriction now has been removed. At the May 25, 1995 meeting of the SIDA Board, a resolution was adopted that SIDA was to proceed with its role as lead agency and that compliance by the agency with the terms of the PDA "is subject to the Agency's obligations to comply with statutory requirements, including but not limited to, those imposed by SEQRA and the EDPL." It was also resolved that "[a]ny inconsistent or contradictory statements made in the past, if any, by or on behalf of the Agency are hereby expressly withdrawn and repealed."

In a July 21, 1995 letter to the Pyramid representative in charge of the project, SIDA spelled out the intent of the resolu-

tion in considerable detail and disavowed the opinion of the former Director of the City Office of Lakefront Development that no alternatives to the project could be considered. The letter emphasized that SIDA is not obligated to reach any particular result "on these or any other matters in considering the Project" and that if SIDA "determines to proceed with acquisition of some or all of the properties in the Redevelopment Area and to provide financial assistance to the project it will do so in accordance with the PDA and other Applicable Requirements." The letter also pointed out that SIDA had no obligation to acquire title to the properties or to provide financial assistance to the project. Pyramid's representative countersigned a copy of the letter to signify Pyramid's concurrence "that SIDA must make an independent decision in conformance with applicable law regarding the Project and is not restrained by the PDA or any other agreement from fulfilling those obligations."

The July 21, 1995 letter, as countersigned, is sufficient to amend the PDA (*see, Lockwood v Embalmers Supply Co.,* 233 App Div 189) and to clarify the understanding between SIDA and Pyramid that SIDA is not committed to reach a particular result. Thus, any restrictions to SIDA's independent judgment have been removed and SIDA's freedom to consider other alternatives to Pyramid's proposed project is no longer compromised.

### III

The contention of petitioners that SIDA improperly curtailed the SEQRA process by not preparing a new Environmental Impact Statement (EIS) is without merit. In determining whether an agency properly carried out its review of the environmental impact of a project, our Court, nearly two decades ago, set forth the standard to be applied. "To support [the agency's] determination, the record must show that it identified the relevant areas of environmental concern, took a 'hard look' at them [citations omitted] and made a 'reasoned elaboration' of the basis for its determination [citation omitted]" (*H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 232).

That is the standard that has been uniformly applied in measuring the validity of a SEQRA review (*see, Matter of Gernatt Asphalt Prods. v Town of Sardinia,* 87 NY2d 668, 688; *Matter of Neville v Koch,* 79 NY2d 416, 424-425; *Matter of WEOK Broadcasting Corp. v Planning Bd.,* 79 NY2d 373, 381-

382; *Akpan v Koch,* 75 NY2d 561, 570, *mot to amend remittitur denied* 76 NY2d 846; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 417; *Matter of Save the Pine Bush v City of Albany,* 141 AD2d 949, 953, *lv denied* 73 NY2d 701; *Matter of Schiff v Board of Estimate,* 122 AD2d 57, 59, *lv denied* 69 NY2d 604; *Aldrich v Pattison,* 107 AD2d 258, 265; *Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 491, *affd* 60 NY2d 805, *rearg denied* 61 NY2d 670). It is also well established that, in reviewing the substantive issues raised in a SEQRA proceeding, an appellate court will not substitute its judgment for that of the agency if the agency reached its determination in some reasonable fashion (*see, Matter of Jackson v New York State Urban Dev. Corp., supra,* at 416-417; *Residents of Bergen Believe in Envt. & Democracy v County of Monroe,* 159 AD2d 81, 84, *appeal dismissed* 76 NY2d 936, *lv denied* 77 NY2d 803; *Matter of Schiff v Board of Estimate, supra,* at 59; *Aldrich v Pattison, supra,* at 267). Our authority "is limited to reviewing whether the determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion * * * While the judicial review must be genuine, 'the agency's substantive obligations under SEQRA must be viewed in light of a rule of reason' " (*Matter of Gernatt Asphalt Prods. v Town of Sardinia, supra,* at 688).

In construing SIDA's obligations under the SEQRA regulations "in light of a rule of reason", we are satisfied that those obligations were met. The SEQRA regulations provide that, prior to the filing of a findings statement, "[t]he lead agency may require a supplemental EIS, limited to the specific significant adverse environmental impacts not addressed or inadequately addressed in the EIS" when a "change in circumstances" arises that may result in a significant adverse environmental effect (6 NYCRR 617.9 [a] [7] [i] [c]). A leading commentator has described the "change in circumstances" language as "a catch-all" provision intended to encompass situations not directly related "to project changes or to the discovery of new information" (Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 3.13 [2] [c], at 3-185—3-186 [1990]). Our annulling of SIDA's earlier determination and findings constituted the "change in circumstances" contemplated by the regulations, and SIDA's decision to proceed with a supplemental EIS in order to specifically address those areas that were found wanting in our earlier decision was reasonable and appropriate.

In reexamining the project, SIDA gave the public, including petitioners, notice of its proceedings and an opportunity to be heard. Petitioners, after receiving SIDA's Supplemental Draft Environmental Impact Statement, took advantage of the opportunity to comment both in writing and personally at the July 20, 1995 public hearing. Given the comprehensive scope of the supplemental environmental review and the level of participation by petitioners, neither they nor the public were prejudiced by SIDA's use of the supplemental review procedure (see, Matter of Wilder v New York State Urban Dev. Corp., 154 AD2d 261, 263, lv denied 75 NY2d 709). It was unnecessary for SIDA to recommence an entirely new environmental review that would neither have more fully implemented the statutory purpose of SEQRA, nor have added anything to SIDA's exhaustively detailed supplemental review. Requiring SIDA to recommence a new environmental review would be contrary to the legislative mandate that lead agencies implement SEQRA "with minimum procedural and administrative delay," and that they "expedite all proceedings * * * in the interests of prompt review" (ECL 8-0107).

## IV

■ Petitioners' challenge to the designation by SIDA of itself as the lead agency appears to be raised for the first time in this proceeding. In any event, we view that challenge as being without merit. Given its continuing role in the project, SIDA is the agency "principally responsible for undertaking, funding or approving" the proposed action (6 NYCRR 617.2 [u]; see, ECL 8-0111 [6]; Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 NY2d 674, 680). SIDA is in the best position to carry out, in accordance with our Sun II decision, the lead agency's "continuing duty to evaluate new information relevant to the environmental impact of its actions [citations omitted], so that important new information will not be ignored by the decision maker [citation omitted]" (Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484, 494-495). SIDA informed the other involved agencies of its intention to continue as lead agency and received the approval of those agencies.

## V

There was no impropriety in the introduction of additional information in SIDA's SFEIS. When, as here, a lead agency conducts a supplemental environmental review, it must follow

the same procedure employed in a primary environmental review and circulate a SDEIS to all of the agencies involved as well as to those parties interested in the outcome, such as the petitioners. Further, the agency, as SIDA did here, should hold a public hearing, schedule a public comment period, and prepare a SFEIS that addresses the concerns raised during the comment period (*see, Matter of Hallenbeck v Onondaga County Resource Recovery Agency*, 225 AD2d 1036; *Residents of Bergen Believe in Envt. & Democracy v County of Monroe, supra,* at 83). It stands to reason that an SFEIS that is responsive to the concerns raised regarding an SDEIS during the comment period will of necessity contain more information than the SDEIS. The SFEIS is by its very nature a more comprehensive document, as it ordinarily amplifies and clarifies the information contained in a SDEIS (*see, Matter of Morse v Town of Gardiner Planning Bd.,* 164 AD2d 336, 341-342; *Matter of Main Seneca Corp. v Erie County Indus. Dev. Agency,* 125 AD2d 930, 931).

## VI

Petitioners contend that SIDA acted arbitrarily and capriciously in arriving at its findings in its supplemental SEQRA review (a) because it failed to consider specific measures necessary to mitigate the traffic impacts caused by the project; (b) because it relied upon undefined future mitigation measures; (c) because the SEQRA review is impermissibly vague concerning the size of the project, its effect on area storm water runoff and the construction of roads that will be required for the project; (d) because the project is incompatible with the Lakefront Area; (e) because the environmental review of the project is impermissibly segmented from the environmental review of other planned Lakefront Area projects; and (f) because adequate consideration was not given to the inevitable interruption of the supply of petroleum to the area by removal of petitioners' bulk storage tanks and terminal facilities.

### (a)

Petitioners again take issue with SIDA's consideration of the potential traffic impacts resulting from the project, contending that SIDA has inadequately recognized the existence of traffic problems and "relied upon general assurances that unidentified developers will take unspecified mitigation measures after the problems develop." That is not, however, an accurate reflection of SIDA's effort. In its SDEIS, SIDA not only incorporated

by reference its earlier studies and findings, but also included a supplemental traffic analysis carried out in May 1995, which analyzed the project individually, as well as in conjunction with other potential redevelopment projects, and presented in considerable detail the observations and conclusions of SIDA's traffic engineers that included proposed mitigation measures. The concerns raised by petitioners were commented upon by SIDA's traffic engineers at length. SIDA prepared an entire volume of expert evidence, including statistical data and related analyses concerning traffic flow in the area affected by the project. Significantly, the State Department of Transportation in its February 1996 letter to SIDA concluded that the scope of the analysis that was made with respect to the highway features under the Department's jurisdiction was acceptable and that the mitigation measures identified at various locations were deemed to be appropriate.

We do not disregard the fact that petitioners' experts have reached a different conclusion. As we stated in *Sun II*, however, "it is not a court's function to resolve the disparity in data presented to an agency. All that is required is that SIDA consider the data and give a reasoned response [citations omitted]" (*Sun Co. v City of Syracuse Indus. Dev. Agency*, 209 AD2d 34, 51, *supra*).

### (b)

SIDA gave studied consideration to the management of storm water runoff, particularly runoff containing water and grease, and the remediation of current petroleum contamination at the site. After considering the geology, ground water and surface water in the SDEIS, and after reviewing the submissions and comments in opposition, those concerns were addressed in the SFEIS with respect to water quality and tank and pipeline relocation, including the resulting effects on the area. The SFEIS fully addressed, among other things, water quality and oil impact remediation. Needless to say, SIDA can hardly be held responsible for existing ground water contamination and its finding that removal of the tanks and pipelines according to regulatory and industry standards would generally improve the area's soil and ground water quality leaves little room for doubt. Acquisition of the project area will result in the removal of the bulk petroleum storage tanks and terminal facilities. As stated in SIDA's findings, "resulting short term impacts will include elimination of the potential for new contamination to enter the ground water from such facili-

ties, continuing feasibility of efforts to remediate existing ground water contamination and eventual improvement of the ground water quality flowing through the soil and into the Barge Canal and Onondaga Lake from the project area. Long term impacts, including an overall improvement in the environmental quality of the Project area and Lakefront Area ground water will be realized as a result of the petroleum facilities removal."

In our view, SIDA has given this subject the requisite "hard look" and petitioners' contentions regarding SIDA's proposed mitigation measures are without merit.

### (c)

In its SDEIS, SIDA states that "[t]he proposed action involves the acquisition by condemnation or otherwise by SIDA of 12 parcels of land for the construction and operation of a ± 850,000 SF GLA [square feet of gross leasable area] retail shopping center to be know as Carousel Landing". The description of the location of the property in the Syracuse Lakefront Area includes annexed graphics. The SFEIS and SIDA's findings reiterate the size and general location of the project, the general description and purpose of the project, including access points, the number of acres of paved surface, the parking spaces per 1,000 square feet of gross leasable area, and the proposed connection for utilities, water supply and sewage disposal. That detailed description of the project supplanted the more general description presented by the City Community Development Director at the public hearing. Although petitioners place great emphasis upon that general oral description, the final written description invalidates their contention that the description is impermissibly vague.

Similarly, we reject petitioners' contentions with respect to the impact of the project on the area's storm water runoff and flood plain and the effect of the possible Harborside Drive extension that is intended to provide a two-lane connection to the project area. In those instances, as well, SIDA gave a careful and detailed description in its findings and, to the extent necessary, SIDA properly commented upon the environmental propriety of the size and utility of the project, the management of storm water runoff and its effect on the flood plain, and the smooth flow of traffic in and about the project site.

### (d)-(e)

In *Sun II* we determined that SIDA, in having failed to consider the impact of the project on the development of other

phases of the Lakefront Area included in the long-range plan, had impermissibly segmented its environmental review (*Sun Co. v City of Syracuse Indus. Dev. Agency, supra,* at 48-49). In its supplemental SEQRA review, SIDA has remedied that defect by including the SEQRA documents concerning other projects contemplated for the Lakefront Area; those documents complement SIDA's detailed SEQRA review of the present project. There is now incorporated in the SDEIS not only the DEIS and FEIS generated in the earlier proceeding, but also the following SEQRA reviews: the DEIS, SDEIS, FEIS and SFEIS for Carousel Center, a related completed shopping center project in the Lakefront Area; the DGEIS and FGEIS for the Franklin Square project, another completed project in the area; the DEIS concerning the lease of New York State Barge Canal land at the Inner Harbor of Onondaga Lake; the DEIS and FEIS for the Thruway Energy Distribution (TED) Park in the Town of VanBuren, contemplated as the new site for petitioners' storage tanks and pipelines; the DGEIS and FGEIS for the Stadium Market Center, also in the area; and various documents analyzing aspects of development of the Syracuse Canal Harbor and the Oil City area. Petitioners' criticism of those amalgamated documents has some substance, but it is difficult to see how SIDA could reasonably have done more in making the necessary showing of the impact of the project on the over-all planned development of the area and the absence of impermissible segmentation, particularly because some of the projects are presently in the conceptual phase and await the development of Carousel Landing before they can be made more precise.

Additionally, in its SDEIS, SIDA included a consideration of the Syracuse Lakefront Area Redevelopment Scenarios and the Syracuse Lakefront redevelopment actions, including the 1990 Inner Harbor general environmental impact review, the 1992 Inner Harbor Core rezoning, the 1994 Syracuse Canal Harbor redevelopment proposal, and the 1994 Aquarium and Research Center proposal, together with maps and other graphics. To remedy its previous failure to consider the environmental ramifications of the project and its failure to present and analyze reasonable alternatives to the project, particularly the proposal of petitioners to consolidate their facilities on a portion of the site (*Sun Co. v City of Syracuse Indus. Dev. Agency, supra,* at 50), SIDA has also included in the SDEIS various alternatives, such as "mixed use retail and Oil City consolidated facility; multi-family housing; mixed use retail and office;

cultural uses; alternate Project sites; and the 'no action' alternative", also accompanied with maps and drawings.

SIDA has also responded in detail in its SFEIS to comments directed at foreseeable potential environmental impacts, not only from the project, but from other contemplated projects that are included in the Redevelopment Scenarios. The SFEIS notes that each of the Redevelopment Scenarios takes into consideration the removal of the oil tanks, and that the proposed consolidation plan of petitioners would be incompatible with the Redevelopment Scenarios because of the existence of the oil tanks. Removal of the oil tanks, SIDA points out, "is integral to the establishment of the Syracuse Lakefront as an urban area with a diversity of land uses, and promotion of tourism, commercial and recreational opportunities. The continued presence of the oil tanks will discourage the private investment necessary to achieve this goal." The SFEIS also notes that the PDA was entered into because no other developers came forward with plans or proposals to develop the project area either before or after the execution of the PDA.

Although the various Lakefront projects and proposals are independent of each other, SIDA found that they have a complementary relationship with each other, that the project is consistent with the redevelopment and revitalization of the entire Syracuse Lakefront, and that the economic development of the project should spur further redevelopment efforts in the Lakefront Area. SIDA found that the no-action alternative would leave Oil City intact, resulting in the loss of the anticipated economic benefits of a revitalized area and the continued threat of contamination from the bulk storage tanks and pipelines.

SIDA has thus presented an environmental review that is no longer impermissibly segmented. Additionally, it has taken into necessary consideration the environmental ramifications of the project, and has made an appropriate analysis of the reasonable alternatives to the project. The prior deficiencies have been thereby fully corrected.

### (f)

As required under our *Sun II* decision, SIDA has weighed the environmental impact of the relocation of petitioners' oil tanks, terminal facilities and pipelines, and has come forward with a potential available site near the Thruway in the Town of VanBuren, in which a nonparty oil company has indicated

some interest. Consideration of the resulting petroleum supply interruption is based upon an analysis made by an industry expert with more than 30 years' experience in bulk petroleum, transportation, distribution, operation and other aspects of the petroleum industry. The conclusions arrived at in the expert's report have not been rebutted or disputed by petitioners, and SIDA would appear to have acted reasonably in electing to credit the report. Review of a lead agency's reasonable reliance upon expert advice is limited (*Sun Co. v City of Syracuse Indus. Dev. Agency, supra,* at 51; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 427, *supra; Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp.,* 157 AD2d 1, 7, *affd* 77 NY2d 970), and we conclude that SIDA has fully and satisfactorily addressed the question of petroleum supply interruption.

## VII

▉ Lastly, petitioners contend that the SIDA board, consisting of five members, violated the Open Meetings Law in various respects, but have presented only conclusory and speculative allegations that such violations occurred. We find no violation arising out of the informal staff meeting in which SIDA's engineering consultant presented a status report regarding the preparation of a preliminary draft of the proposed SFEIS. It appears that only two members were present throughout the greater part of the staff meeting and that the third member did not arrive until almost the end of the meeting. The affidavits executed by the three members show that no discussions of substance, voting or other action took place at the meeting. Petitioners refer to other occasions, but at those times there was no quorum present. In the absence of a quorum, the Open Meetings Law does not apply (*see, Matter of Tri-Village Publs. v St. Johnsville Bd. of Educ.,* 110 AD2d 932, 933; *Matter of Sciolino v Ryan,* 81 AD2d 475, 478). Even where a quorum is present, a meeting does not rise to the level of public business implicating the Open Meetings Law where the participants meet in a casual encounter rather than with the intent to conduct public business (*see, Matter of Goodson Todman Enters. v City of Kingston Common Council,* 153 AD2d 103, 105; *Hill v Planning Bd.,* 140 AD2d 967, 968).

Although courts are empowered "in their discretion and upon good cause shown, to declare void any action taken by a public body in violation of the mandate of this legislation" (*Matter of New York Univ. v Whalen,* 46 NY2d 734, 735

[emphasis omitted]), it is the challenger's burden to show good cause warranting judicial relief (*see, Matter of Gernatt Asphalt Prods. v Town of Sardinia,* 87 NY2d 668, 686, *supra; Matter of New York Univ. v Whalen, supra,* at 735). Petitioners have not met their burden of establishing that the SIDA board members carried out public business in private (*see, Town of Moriah v Cole-Layer-Trumble Co.,* 200 AD2d 879, 881), or that they attempted to circumvent the provisions of the Open Meetings Law (*see, Incorporated Vil. of Philmont v X-Tyal Intl. Corp.,* 67 AD2d 1039, 1040).

## VIII

We have considered the other contentions of petitioners and conclude that they are without merit.

Accordingly, the determination of SIDA in each proceeding should be confirmed and the petition in each proceeding dismissed.

PINE, J. P., FALLON, WESLEY and BALIO, JJ., concur.

Determination unanimously confirmed, without costs, and petition dismissed.

SUN COMPANY, INC. (R & M) et al., Petitioners, v CITY OF SYRACUSE INDUSTRIAL DEVELOPMENT AGENCY, Respondent. (Proceeding No. 2.) [646 NYS2d 486] —Determination unanimously confirmed without costs and petition dismissed. Same opinion by Boehm, J., as in *Mobil Oil Corp. v City of Syracuse Indus. Dev. Agency* (224 AD2d 15 [decided herewith]). (Original Proceeding Pursuant to EDPL 207.) Present—PINE, J. P., FALLON, WESLEY, BALIO and BOEHM, JJ.