484

GLEN HEAD — GLENWOOD LANDING CIVIC COUNCIL, INC., et al., Respondents, v TOWN OF OYSTER BAY et al., Appellants.

Second Department, August 30, 1982

APPEARANCES OF COUNSEL

*Cohn & Foley* (*William S. Cohn* of counsel), for Alvin Benjamin, appellant and *Milton L. Levine* for Glen Head Country Club, Inc., appellant (one brief filed).

*Nathaniel G. Gole, Town Attorney* (*John A. Paider* of counsel), for Town of Oyster Bay and others, appellants.

*Carlino & Scharf, P.C.* (*Joseph F. Carlino, Julian Jawitz* and *Simon B. Jawitz* of counsel), for respondents.

OPINION OF THE COURT

LAZER, J.

ECL article 8 (see L 1975, ch 612),[1] the State Environmental Quality Review Act (SEQRA), is modeled on the National Environmental Policy Act (NEPA, US Code, tit 42, § 4321 *et seq.*), and, like the national legislation,[2] it concentrates on the environmental impact of projects and activities which are undertaken or approved by public agencies. SEQRA's purpose is to compel the agencies principally responsible for the ultimate action-taking decision to give the environment its deserved due in deciding whether the specific proposal under consideration is to proceed (ECL 8-0103, subd 7; *Matter of Town of Henrietta v*

---

1. The article is one of a series of environmental enactments by the Legislature in the 1970's (see, e.g., Adirondack Park Agency Act [L 1971, ch 706, as amd L 1973, ch 348; Executive Law, art 27]; Tidal Wetlands Act [L 1973, ch 790; ECL art 25]; Wild, Scenic and Recreational Rivers System Act [L 1973, ch 400; ECL art 15, tit 27]; Freshwater Wetlands Act [L 1975, ch 614; ECL art 24]).

2. Thirteen other States have enacted environmental statutes of broad applicability, four have imposed environmental impact schemes through executive direction, and eight others have adopted legislation of limited applicability (Environmental Quality-1979, Tenth Ann Report of Council on Environmental Quality, pp 595-602; 2 Grad, Treatise on Environmental Law, § 9.07).

*Department of Environmental Conservation of State of N. Y.,* 76 AD2d 215; see, generally, Varley, The New York State Environmental Quality Review Act: An Overview and Analysis, 41 Alb L Rev 293). The statutory scheme attempts to achieve this purpose by designating the public agency most significantly involved in a particular project as the "lead" agency and by obliging that body to partake in a series of procedures intended to expose and explore the environmental consequences of the determination which finally approves the project. In the final step of the SEQRA process, the agency must make written findings concerning the environmental impact of its decision. SEQRA has also been implemented — and somewhat elucidated — by a detailed set of regulations (6 NYCRR Part 617) adopted by the State Department of Environmental Conservation (DEC). Our burden here is to determine whether the Town of Oyster Bay complied with SEQRA in the course of rezoning certain property in the Glen Head area.

As early as possible in the SEQRA process, the agency "having principal responsibility for carrying out or approving" a given project or activity — the "lead" agency (ECL 8-0111, subd 6) — must determine whether an environmental impact statement (EIS) should be prepared with reference to the proposal submitted (ECL 8-0109, subd 4; 8-0111, subd 6). If the lead agency determines that the project "may have a significant effect on the environment", either the agency or the applicant — at the latter's option — must prepare a draft environmental impact statement (DEIS) (ECL 8-0109, subds 2, 4). If the draft statement is accepted by the agency "as satisfactory with respect to scope, content and adequacy", it is then circulated to the DEC, other agencies having an interest in the proposal, and "interested members of the public" (ECL 8-0109, subds 4, 5; 6 NYCRR 617.8 [b], 617.10). After allowing a period for comment, the lead agency must prepare a final environmental impact statement (FEIS) and circulate it in the same manner as the draft statement (ECL 8-0109, subds 4, 5, 6; 6 NYCRR 617.10 [h]). Finally, upon adoption of the environmental-affecting proposal by the lead agency, it is required to make explicit findings that (1) the requirements of SEQRA have been met, and (2)

adverse environmental effects revealed in the EIS process will be minimized or avoided to the maximum extent possible (ECL 8-0109, subd 8; 6 NYCRR 617.9 [c]).

Resolution of the instant litigation turns entirely on the question of SEQRA compliance. Various civic groups and individuals have obtained a judgment nullifying the Oyster Bay Town Board's action in amending its zoning ordinance by rezoning 21.57 acres of property from a predominantly one-acre single-family residential district to a condominium category which would permit five units to the acre. The defendants — and appellants here — are the town, its town board, and the contract vendor and vendee of the property, Glen Head Country Club, Inc., and Alvin Benjamin, respectively. The land involved, previously part of the Glen Head Country Club golf course, lies immediately south of the City of Glen Cove on the western side of Cedar Swamp Road (New York State Route 107). Benjamin's contract to purchase was conditioned on his ability to obtain condominium zoning, with a price fixed at $1,250,000 if the new zoning permitted 126 units or less, plus additional sums if more units were permitted. Under the existing zoning, approximately 20 to 25 single-family homes could have been built on the site.

When Benjamin applied for the rezoning in September, 1977, there was in effect in Oyster Bay a local law designed to meet the SEQRA mandate that affected agencies adopt procedures to implement the statutory requirements (see ECL 8-0113, subd 3; 6 NYCRR 617.4 [a], [b]). By Local Law No. 3 of 1977, the town board had created a Town Environmental Quality Review (EQR) Commission, and, in essence, delegated to the commission all of the town board's lead agency obligations and responsibilities under SEQRA. The delegation included the duty to make the findings SEQRA required (see Local Laws, 1977, No. 3 of Town of Oyster Bay, §§ 8, 10, 11).

Nine months after Benjamin filed his application, the EQR Commission notified him that his proposal might have a significant impact on the environment and directed him to prepare a draft environmental impact statement. The commission's principal concern was the disposal of sewage which would emanate from the development. The

draft statement submitted by Benjamin proposed to solve that problem by the use of septic tanks and cesspools while rejecting alternative disposal methods such as a dryline sewer system or an on-site sewer plant because no sewer district was anticipated for the area and the Nassau County Health Department was not granting approvals for private sewer plants. The EQR Commission rejected the draft statement because septic tanks and cesspools presented a potential for contamination of Cedar Swamp Creek, which flows into Hempstead Harbor. To the commission's further request that more information be supplied, Benjamin responded by submitting a 105-page draft statement containing three alternative solutions to the sewage disposal problem. Two of the alternatives — drylines and a private sewer system — previously had been rejected by Benjamin, but the third alternative suggested that the condominium sewage be disposed of by hooking into sewage treatment facilities in the City of Glen Cove. Benjamin's draft statement indicated that Glen Cove officials had made a verbal commitment to permit such a tie-in.

In June, 1979, after having accepted Benjamin's draft statement and circulated it with comments to other agencies as the final environmental impact statement, the EQR Commission issued findings (pursuant to Local Law No. 3 of 1977) that the applicant had complied with SEQRA and the proposal "will avoid adverse environmental effects to the maximum extent practicable." The commission explicitly relied upon Benjamin's receipt of written approval from the City of Glen Cove to use its sewer system.[3] These findings were intended to meet the SEQRA requirement that the lead agency make environmental findings in connection with the action approving the proposal under consideration.

Four months later, with the rezoning still under consideration by the town board, Celia Swing, President of Glen

---

3. The commission apparently relied upon an April, 1979 letter received from Glen Cove's Commissioner of Public Works. The reference in the DEIS to an oral commitment from the City of Glen Cove predated this letter; no further elaboration as to which city official furnished this verbal commitment is provided in the draft or final impact statement.

Head — Glenwood Landing Civic Council, advised the Town Supervisor that the Glen Cove City Council had not approved the use of its sewage treatment plant by the condominium project. The Town Attorney responded that the Glen Cove Commissioner of Public Works favored the hook-up and that Benjamin was willing to covenant to the construction of an on-site sanitation plant should the Glen Cove system be unavailable. In November, 1979, Swing furnished the supervisor with a copy of a letter from the Mayor of Glen Cove that the necessary approval of the city council had not been obtained and two months later she provided a further letter from the State Department of Environmental Conservation rejecting the alternatives to the Glen Cove system and stating that discharge of sewage through septic tanks would violate State groundwater standards and that an on-site sewage treatment plant would be costly and might not be acceptable.

Despite the negative orientation of these communications, on January 15, 1980, the town board rezoned the Benjamin property while limiting development to 112 units with sewage to be disposed of by hook-up to the Glen Cove sewer system or, alternatively, through "an on-site sanitation system approved by the Nassau County Department of Health". The town board's resolution contained no SEQRA findings and provided no comment concerning the sewage controversy or the additional environmental information which had surfaced subsequent to the EQR findings and the rezoning hearing. This action followed.

Following a trial, Special Term declared the rezoning void because the town board had failed to (1) issue a written statement finding that SEQRA's requirements had been satisfied (ECL 8-0109, subd 8; 6 NYCRR 617.9 [c]); (2) provide adequate notice and opportunity to the public (i.e., civic associations) to review both the draft and final environmental impact statements; and (3) consider newly discovered evidence which raised serious unresolved sewage disposal problems (*Glen Head — Glenwood Landing Civic Council v Town of Oyster Bay*, 109 Misc 2d 376).

■ The first of defendants' challenges to the judgment concerns plaintiffs' standing to bring the action. But under the "zone of interest" doctrine which has liberalized earlier

and harsher concepts concerning standing (see *Matter of Fritz v Huntington Hosp.,* 39 NY2d 339; *Matter of Dairylea Coop. v Walkley,* 38 NY2d 6; *Boryszewski v Brydges,* 37 NY2d 361; *Matter of Douglaston Civic Assn. v Galvin,* 36 NY2d 1) plaintiffs need only to have demonstrated that the rezoning would have a harmful effect on them and "that the interest asserted is arguably within the zone of interest to be protected by the statute" (*Matter of Dairylea Coop. v Walkley, supra,* p 9). Since the individual plaintiffs and members of the civic associations live in close proximity to the acreage in issue and the asserted environmental consequences of the instant project fall within the zone of interest protected by SEQRA, the requisite showing has been made (see *Matter of Tuxedo Conservation & Taxpayers Assn. v Town Bd. of Town of Tuxedo,* 69 AD2d 320; *Webster Assoc. v Town of Webster,* 112 Misc 2d 396, affd 85 AD2d 882; *Bliek v Town of Webster,* 104 Misc 2d 852; *Ecology Action v Van Cort,* 99 Misc 2d 664). We also agree with Special Term that there should be no distinction between plaintiffs who reside in the town and those beyond its borders, since the environmental effects of the proposed development are matters of more than local consequence that will affect residents and nonresidents.

■■ The attack on the timeliness of the action is also without merit; the right to raise the affirmative defense of the Statute of Limitations was waived when defendants failed to move to dismiss on this ground or to raise the defense in their answers (see CPLR 3211, subd [e]; *Auto Body Federation of Empire State v Lewis,* 80 AD2d 593; *Doroski v Mintler,* 49 AD2d 990). Neither is there any basis for defendants' claim that the EQR Commission is a necessary party. This court can afford the present parties complete relief in the commission's absence (see CPLR 1001, subd [a]; *Matter of Castaways Motel v Schuyler,* 24 NY2d 120, 125, on rearg 25 NY2d 692) and that body's interests (if any) will be protected by the town board (see *Matter of Greaney v Poston,* 50 AD2d 653).

We turn, then, to the validity of the town's efforts to comply with SEQRA. Literal compliance is required because the Legislature has directed that the policies of the State and its political subdivisions shall be administered

"to the fullest extent possible" in accordance with SEQRA (ECL 8-0103, subd 6; *Matter of Rye Town/King Civic Assn. v Town of Rye,* 82 AD2d 474, apps dsmd 55 NY2d 747; see, also, *Matter of Niagara Recycling v Town Bd. of Town of Niagara,* 83 AD2d 335, 340). Substantial compliance will not do, for that would conflict with SEQRA's underlying purposes and tempt State and local agencies to circumvent SEQRA's mandates (*Matter of Rye Town/King Civic Assn. v Town of Rye, supra,* p 481; *Matter of Schenectady Chems. v Flacke,* 83 AD2d 460).

We conclude that the town's compliance with SEQRA was vitally deficient in a number of respects. To begin, the town board's failure to make the necessary "explicit" SEQRA findings in rezoning the property was fatal. ECL 8-0109 (subd 8) provides that: "When an agency decides to carry out or approve an action which has been the subject of an environmental impact statement, it shall make an explicit finding that the requirements of this section have been met and that consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided." To this statutory language the Department of Environmental Conservation regulations add that "[n]o agency, whether lead agency or not, shall make a final decision to * * * approve an action * * * until it has * * * prepared a written statement of the facts and conclusions relied upon in the EIS, supporting its decision and indicating the social, economic and other factors and standards which formed the basis of its decision" (6 NYCRR 617.9 [c] [3]).

Defendants contend that the EQR Commission's environmental findings of June, 1979, satisfied the requirements of SEQRA and there was no further necessity for the town board to make findings in the rezoning resolution of January 15, 1980. We find this contention wholly baseless. The lead agency is the one which must co-ordinate the social, economic and environmental factors involved in order to arrive at a decision, and therefore it is the lead agency which must render the requisite environmental findings as part of the decision. For the reasons that follow,

we regard any contrary interpretation as subversive of the statute whose compelling logic requires the decision-making agency to analyze the social, economic and environmental mix before deciding the ultimate issue.

SEQRA's primary mandate is to incorporate environmental concerns into the decision-making process of State and local agencies (see ECL 8-0103, subd 7; 6 NYCRR 617.1 [d]; *Matter of Town of Henrietta v Department of Environmental Conservation of State of N. Y.,* 76 AD2d 215, 222, 226, *supra;* Governor's Memorandum, NY Legis Ann, 1975, p 438). The test of SEQRA compliance is whether the approving agency has taken a "hard look" at the relevant areas of environmental concern (see *Matter of Schenectady Chems. v Flacke,* 83 AD2d 460, *supra; H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 232; see, also, *Kleppe v Sierra Club,* 427 US 390, 410, n 21) and taken those concerns into account " 'to the fullest extent possible' " (*Matter of Town of Henrietta v Department of Environmental Conservation of State of N. Y., supra,* p 223; *Webster Assoc. v Town of Webster,* 85 AD2d 882, 884, *supra*). By circulating the reasons for its environmental decision, the lead agency gives an outward sign that environmental values and consequences have been considered (see *Andrus v Sierra Club,* 442 US 347). But when a lead agency fails to make the required findings, neither the public nor a reviewing court knows what factors were considered, and they cannot be satisfied that the required hard look has been taken. For all the present record reveals, the town board adopted its rezoning resolution in the same manner to which it was accustomed before SEQRA's enactment (see *No Oil v City of Los Angeles,* 13 Cal 3d 68).

It is plain, then, that the delegation of lead agency decision-making obligations is inconsistent with the SEQRA review and consideration functions. The view we express is supported by jurisprudence in a major sister State, California, whose Environmental Quality Act (CEQA) is quite similar to SEQRA (see Cal Public Resources Code, §§ 21000-21176; see, also, Varley, The New York State Environmental Quality Review Act: An Overview and Analysis, 41 Alb L Rev 293). In *Kleist v City of*

*Glendale* (56 Cal App 3d 770, 779), the California Court of Appeals rejected the Glendale City Council's delegation of duties to its Environmental and Planning Boards on the ground that it "insulates the members of the council from public awareness and possible reaction to the individual members' environmental and economic values" and because the environmental impact report (California's equivalent to our environmental impact statement) would not "serve its informational function unless it is reviewed and considered by the governmental body which takes action having an effect upon the environment." Absent findings by the action-taking body, the various mechanisms SEQRA has designed to require agencies to consider the environmental impact of their actions (see *Pacific Legal Foundation v Andrus,* 657 F2d 829, 836; *State of California v Bergland,* 483 F Supp 465, 482; Agency Decisionmaking Under the Wisconsin Environmental Policy Act, 1977 Wis L Rev 111, 118) simply become additional passages in a bureaucratic maze that inhibits economic growth and inflates public and private expense without compelling the decision maker to give the environment the attention it merits in determining the outcome of a proposal. The responsibility for environmental review is vested with the agencies making the final decisions (see Memorandum of NY State Dept of Environmental Conservation, July 30, 1975, Bill Jacket of L 1975, ch 612, p 3). What the Oyster Bay Town Board impermissibly did in delegating its SEQRA obligations to the EQR Commission was to create a permanent lead agency for the town (see 1979 Opns Atty Gen 136). That action amounted to an evasion of SEQRA responsibilities.

Since the State Constitution prohibits the enactment of local laws that are inconsistent with the Constitution or any general law (NY Const, art IX, § 2, subd [c]; see, also, Municipal Home Rule Law, § 10, subd 1, par [i]; *Wholesale Laundry Bd. of Trade v City of New York,* 17 AD2d 327), to the extent that Local Law No. 3 of 1977 delegates the environmental decision-making responsibility and the rendering of findings to the EQR Commission, it is clearly inconsistent with SEQRA and invalid. Accordingly, the rezoning is a nullity.

The town board's conduct in this case fails to pass statutory muster in another vital respect. Considering the importance of the circulation and comment provisions of SEQRA (ECL 8-0109, subd 6; 6 NYCRR 617.9 [a], 617.10; *Webster Assoc. v Town of Webster,* 85 AD2d 882, 883, *supra*), some of the significant information received by the town board after completion of the environmental impact statement should have been circulated to outside agencies. By mandating review by outside agencies, the circulation and comment requirements insure "informed decision making by providing procedural inputs for all responsible points of view on the environmental consequences of a proposed * * * action" (see *I-291 Why? Assn. v Burns,* 372 F Supp 223, 257, affd 517 F2d 1077; see, also, *Trout Unlimited v Morton,* 509 F2d 1276; *State of California v Bergland,* 483 F Supp 465, 482, *supra*), guard against lead agency error or bias (*Essex County Preservation Assn. v Campbell,* 536 F2d 956, 961; *Appalachian Mountain Club v Brinegar,* 394 F Supp 105, 121; *I-291 Why? Assn. v Burns,* 372 F Supp, at p 258), and help the lead agency identify problems, thereby improving its evaluation of a proposed project (*Concord Twp. v United States,* 625 F2d 1068, 1074).

In recognition of these benefits, the Federal judiciary has required the distribution of a supplemental impact statement when significant new circumstances or information have been disclosed to the agency (see *Warm Springs Dam Task Force v Gribble,* 621 F2d 1017; *Essex County Preservation Assn. v Campbell, supra; Society for Animal Rights v Schlesinger,* 512 F2d 915; *I-291 Why? Assn. v Burns, supra;* see, also, 40 CFR 1502.9 [c] [1] [i], [ii]). The decision as to whether a supplement should be required has been based on the probative value of the information, its probable accuracy, and the present state of information contained in the impact statement (see *Adler v Lewis,* 675 F2d 1085, 1098; *Warm Springs Dam Task Force v Gribble, supra*). A related principle to the circulation requirement is the agency's continuing duty to evaluate new information relevant to the environmental impact of its actions (see *Warm Springs Dam Task Force v Gribble, supra,* p 1023; *Essex County Preservation Assn. v Campbell, supra,*

pp 960-961), so that important new information will not be ignored by the decision maker (see *Silva v Lynn,* 482 F2d 1282, 1285).

Here, it is apparent that the outside public agencies involved relied heavily on the assurance in the impact statement that a sewer hook-up commitment had been received from Glen Cove. It is equally obvious that review of the alternative sewage disposal plans by other agencies was muted because of the desirability of the Glen Cove hook-up. We agree,,then, with Special Term's conclusion that as a result of this failure to communicate "the vital issue of the sewerage was passed over as having been fully satisfied and the attention of the concerned agencies [was] diverted elsewhere" (109 Misc 2d, at p 385). The new material was not only accurate and highly relevant, it was at the heart of the environmental objections to the project since both the State Conservation Department and the EQR Commission had rejected the alternative sewage disposal plans. Accordingly, a supplemental impact statement analyzing the project in light of the Swing disclosure should have been circulated and reviewed in the same manner as an original statement.

■ Finally, there is the matter of the town board's failure to provide a copy of the draft and final impact statements to the plaintiff Glen Head — Glenwood Landing Civic Council while copies were being circulated to the various governmental agencies. Although the statute merely requires that these SEQRA documents be circulated to "interested members of the public" (ECL 8-0109, subds 4, 6), the regulations provide that a copy of such statements shall be made available to "persons requesting it" (6 NYCRR 617.10 [e], [h]). While the importance of public participation in the SEQRA process is patent (see *Webster Assoc. v Town of Webster,* 85 AD2d 882, *supra; Matter of Marino v Platt,* 104 Misc 2d 386, 389), there is no affirmative duty upon governmental entities to circulate SEQRA statements to the public in the absence of a specific request from interested persons. Some eight months prior to distribution of the draft statement to the relevant agencies, Mrs. Swing had requested notification of the public hearing date, with no concomitant request for an environmental

impact statement. In July, 1979, the EQR Commission furnished a copy of the final statement to Mrs. Swing as a result of her specific request for it. There has been no violation of the town's duty to furnish copies of the environmental impact statement to "interested members of the public."

The reasons we have outlined mandate an affirmance.

DAMIANI, J. P., BROWN and NIEHOFF, JJ., concur.

Judgment of the Supreme Court, Nassau County, dated June 16, 1981, affirmed, without costs or disbursements.