*347 OPINION OF THE COURT
Joseph Goldstein, J.
In their proceeding pursuant to CPLR article 78 (action No. 1), petitioners seek to compel respondent Anderson to issue a default certificate of approval pursuant to Town Law § 276 (4). The proposed subdivision is located in the Town of East Hampton on the north side of Montauk Highway, just east of the Village of East Hampton.
In its order (dated Aug. 18, 1986) which denied respondents’ motion to dismiss and enjoined the Town of East Hampton from rezoning the subject parcel this court narrowed the issues under consideration herein. The questions, simply put, are (1) was the Planning Board’s attempted rescission of its declaration that an environmental impact statement (EIS) was unnecessary for the subdivision (otherwise known as a "negative declaration” or a "determination of nonsignificance”) tantamount to inaction, which entitles petitioners to a default certificate, and (2) is the Planning Board bound by a self-imposed 45-day time limit for further action on petitioners’ application?
It is important to note, as was stated in this court’s prior order, that the substantive merits of the Planning Board’s decision to rescind the negative declaration and the fashion in which the resolution of rescission dated April 16, 1986 was adopted, are not at issue in this proceeding. Petitioners do dispute the basis for the rescission and object to the Board’s alleged failure to afford them notice and an opportunity to be heard. Nevertheless, not having challenged that determination within 30 days, the petitioners cannot challenge in this proceeding the substance of the Board’s action (Town Law § 282). In essence, then, this proceeding is one in the nature of mandamus to compel, rather than mandamus to review. Thus, consideration by this court of whether the Planning Board was possessed of "important or significant new information” warranting the rescission and of the manner in which the attempted rescission was accomplished is inappropriate.
Resolution of this matter turns on whether the alleged "action” the Planning Board did take overcomes petitioners’ right to a default certificate. Absent the State Environmental Quality Review Act (ECL art 8; SEQRA), the Town Law would entitle petitioners to approval, since the Planning Board did not, "conditionally approve, conditionally approve with or without modification, disapprove, or grant final approval” to petitioners’ final plat (Town Law § 276 [4]).
*348 SEQRA requires a Planning Board to follow certain procedures based upon particular criteria before approval or disapproval of an application submitted to it. One of the principal functions of the Planning Board is to make public to as great an extent as possible the applications pending before it and in particular any perceived impact the applications might have upon the environment. SEQRA’s primary mandate is to incorporate environmental concerns into the decision-making process of State and local agencies (Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484).
The test of SEQRA compliance is whether the approving agency has taken a "hard look” at the relevant areas of environmental concern (Webster Assocs. v Town of Webster, 85 AD2d 882, 884) and taken those concerns into account "to the fullest extent possible” (ECL 8-0103 [6]).
This saga commenced in May of 1985, when the owner and developers of the parcel in question sought the Planning Board’s approval for a seven-lot subdivision totaling some 12 plus acres. The property is situated in the neighborhood-business and commercial-industrial zones along the north side of Montauk Highway, in the Town of East Hampton. The property in question is bounded on three sides by lands owned by public entities: the Long Island Railroad on the north, Town of East Hampton on the west, the Suffolk County Water Authority on the east, together with some vacant, privately owned residential property on the east and south. The subdivision is directly east of the East Hampton Town Hall.
The developers submitted their preliminary plat to the Town Planning Board on May 29, 1985. Submission was also made to the County Health Department, County Planning Commission and State Department of Environmental Control. The New York State Department of Transportation was given notice for approval of curb cuts. The evaluation form of the East Hampton Planning Department notes that a 50-foot-wide right-of-way ("tap” street) shall run between lots 1 and 2 and the town hall property; and that as of June 13, 1985, the lots had changed in size but the total number of lots remained the same.
After a site analysis and permit or review checklist for interagency approval, the staff comments reflect the following: "6. staff comments and recommendations: Several of the lots have changed size since pre-preliminary approval was granted, but the overall number of lots has remained the *349 same. Lots 3 and 4 proposed for affordable housing have been reduced from 3.4 to 3.1 acres and lots 5 and 7 have increased from 1.2 to 1.8 and from 1.8 to 2.0 acres, respectively. The proposed cul-de-sac has reduced in length from 850 to 750 linear feet. Easements should be provided to insure that the existing large maple trees will be protected. A negative declaration pursuant to SEQRA is recommended” (emphasis added).
There is in addition a list of inquiries regarding the impact of various items of concern including "water” and the possibility of public controversy with which the Planning Board dealt.
A public hearing was scheduled and conducted pursuant to a notice adopted June 26, 1985. The meeting notice contained a specific reference to the fact that a negative declaration had been "made pursuant to SEQRA” (emphasis added). Negotiations had been commenced, and, among other things, the Planning Board "asked” the petitioners to insert the "tap” street. This was apparently done to alleviate any possible traffic hazards which development of the subdivision might create. Apparently no traffic concerns were raised by the populace at the July 24, 1985, public hearing.
The Planning Board relied upon its own expertise and knowledge of local conditions and recommended the negative declaration pursuant to SEQRA provided that "the mitigating measures are incorporated into the project.”
As Justice Lazer stated in his exhaustive review of SEQRA,
"SEQRA’s purpose is to compel the agencies principally responsible [in this case the Planning Board of the Town of East Hampton] for the ultimate action-taking decision to give the environment its deserved due in deciding whether the specific proposal under consideration is to proceed (ECL 8-0103, subd 7 * * *). The statutory scheme attempts to achieve this purpose by designating the public agency most significantly involved in a particular project as the lead’ agency and by obliging that body to partake in a series of procedures intended to expose and explore the environmental consequences of the determination which finally approves the project * * *
"As early as possible in the SEQRA process * * * the 'lead’ agency * * * must determine whether an environmental impact statement (EIS) should be prepared with reference to the proposal submitted” (Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484, 485-486, supra [emphasis added]).
This the East Hampton Planning Board did. Moreover, it *350 circulated its negative declaration to the New York State Department of Transportation, the Suffolk County Department of Health Services and the Suffolk County Planning Commission.
Considering that the petitioners’ application was received in May of 1985, the Planning Board certainly acted within the spirit of ECL 8-0109 (4) which requires prompt action by lead agencies. On August 28, 1985, the Planning Board, having conducted the public hearing, made certain findings of fact.
Among other things, the Board’s findings addressed the issues of water usage and traffic impact. In the findings, the Planning Board also stated for the record that "[a] negative declaration has been made pursuant to S.E.Q.R.”
The Planning Board also passed a resolution granting a six-month preliminary plat approval, copies of which were sent to the applicant, the Suffolk County Planning Commission and the Suffolk County Department of Health Services.
Interestingly enough, prior to the first public hearing, the Planning Board, in a memo dated May 15, 1985, directed its concerns to the petitioners which, among others, included reference to traffic impact, creation of a "tap” street, ingress and egress, parking and speed limit. Petitioners acted promptly and the Planning Board received a response on May 22, 1985.
The public resolution of August 28, 1985, together with the findings of fact, the conditions attached to the preliminary plat approval and the notification to other concerned agencies, would appear to satisfy the SEQRA mandate to circulate the reasons for an environmental decision. (Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484, 492, supra.)
The facts and the import of them in this case clearly are distinguishable from those found by Justice Lazer to have existed in Glen Head (supra). In the Glen Head case, from the very inception the approvals were conditioned upon certain sewage concerns being satisfied. These not only were not accomplished, but apparently were impossible to perform. In the Glen Head matter a local municipality refused to permit sewer hookups to its sewage plant and this factor was not dealt with by the agency responsible for final approval. As the court in Glen Head held (supra, at 494): "Considering the importance of the circulation and comment provisions of SEQRA * * * some of the significant information received by *351 the town board after completion of the environmental impact statement should have been circulated to outside agencies. By mandating review by outside agencies, the circulation and comment requirements insure 'informed decision making by providing procedural inputs for all responsible points of view on the environmental consequences of a proposed * * * action’ * * * guard against lead agency error or bias * * *.and help the lead agency identify problems, thereby improving its evaluation of a proposed project”.
Furthermore, the court held that there is a "continuing duty” on the "lead” agency, "to evaluate new information relevant to the environmental impact of its actions * * * so that important new information will not be ignored by the decision maker” (Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, supra, at 494-495 [emphasis supplied]).
In the case at bar, there has been no proof of any "significant” or "important new information” being supplied to the Planning Board in regard to traffic or safety conditions which the Board had not previously considered. In fact, the Planning Board, in its approving resolution of August 1985, specifically limited vehicular access onto Montauk Highway.
Both petitioners and respondents cite Matter of Sun Beach Real Estate Dev. Corp. v Anderson (98 AD2d 367) in support of their position. This is also a decision of Justice Laser in which he states "[u]nder the Town Law, a Planning Board which fails to act on a preliminary subdivision plat application within 45 days is deemed to have approved the preliminary plat” and refers to. this statutory requirement as a rigorous mandate for prompt action (Matter of Sun Beach Real Estate Dev. Corp. v Anderson, supra, at 367).
The case at bar concerns a final plat approval, but the requirements of the statute are no less rigorous. The statute provides that unless extended by mutual consent of the owner and the Planning Board, "the planning board shall by resolution conditionally approve with or without modification, disapprove, or grant final approval * * * within 45 days after the * * * hearing * * * In the event a planning board fails to take action on a final plat within the time prescribed therefor, the plat shall be deemed approved and a certificate of the clerk of the town * * * shall be issued” (Town Law § 276 [4] [emphasis added]). There is no question but that the Planning Board did not approve; did not disapprove; did not conditionally approve; nor conditionally approve with or without modification.
*352 SEQRA requires "a statement * * * of the [important] environmental impacts of the proposed action” and "an identification and brief discussion of any adverse environmental [effects] which cannot be avoided * * * if the proposed action is implemented” (6 NYCRR 617.14 [f] [3], [4]). SEQRA also requires an agency " 'to list ways in which any adverse effects * * * might be minimized’ * * * but it does not require an agency to impose every conceivable mitigation measure, or any particular one. Rather, in accordance with its balancing philosophy, SEQRA requires the imposition of mitigation measures only 'to the maximum extent practicable’ 'consistent with social, economic and other essential considerations’ * * * Moreover, nothing in the act bars an agency from relying upon mitigation measures it cannot itself guarantee in the future. Just as an agency must take a hard look at alternatives and consider a reasonable range of alternatives * * * so, too, must an agency, employing a rule of reason, take a hard look at and consider potential mitigation measures” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 421-422).
In this case there is neither deception, nor failure to prepare either an EIS or negative declaration. Before the negative declaration was issued, the Planning Board, the "lead” agency, called for and conducted a public hearing.
By evaluation dated June 12, 1985, prior to the preliminary approval and the issuance of the negative declaration, and prior to the first public hearing in this matter, the Board’s planning department reported its assessment of the project’s lack of or minimal environmental impact. That report was available to the public, and in the "comments” section the Planning Board stated: "The environmental assessment indicates there will be some small to moderate impacts associated with the project which have a good potential for mitigation. The Planning Department recommends a negative declaration pursuant to SEQRA be filed provided the mitigating measures are incorporated into the project.”
Judge Kaye, of the New York Court of Appeals, has stated: "While strict compliance with prescribed procedures is required, nothing in SEQRA or its regulations expressly calls for issuance of a SEIS [supplemental environmental impact statement]. Indeed, a supplemental statement is not even mentioned [in either the statute or the regulations]. However, an agency making a final decision about a project must make findings that the environmental concerns of the act have been *353 considered and satisfied * * * and from this it may reasonably be inferred that an agency must prepare a SEIS if environmentally significant modifications are made after issuance of a FEIS [final environmental impact statement]. * * * Whether or not a modification is significant is generally a decision to be made by the agency after taking a 'hard look’ * * * Here UDC plainly acted within its discretion in deciding not to issue a supplementary statement only after concluding that the modifications would not be environmentally significant — the same determination made by an agency in the first instance in issuing a negative declaration * * * Just as no public hearings are required in the case of a negative declaration, so nothing in the statute requires that the hearing process be reinstituted as to modifications which will not have a significant effect on the environment” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 429-430, supra [emphasis added]).
The town has perhaps most clearly indicated its own interpretation of the situation found in the case at bar. Local Law of the Town of East Hampton adopted May 18, 1984, as LL 15-1984, entitled "Town of East Hampton Environmental Quality Review Law”, provides in section 75-7 (E) "Environmental Assessment and Determination of Significance”: "E. If the lead agency makes a determination of non-significance, the direct action, approval or funding involved in the action, as well as the decisions involved with the same, may be processed without further regard to SEQRA, Part 617, or this chapter” (emphasis added).
The record is clear that at the first public hearing (preliminary plat approval July 1985) there was no opposition indicated by any person to the granting of the certificate of nonsignificance (negative declaration) nor were there any changes or modifications made by petitioners prior to their request for final approval.
It was not until the February 1986 public meeting, at which time there was what petitioners infer was an orchestrated outcry, that the question of "traffic impact” reared its head for the first time since the days the lead agency reviewed this matter and issued the negative declaration.
The respondents now argue that even at the last moment the Planning Board has the authority to rescind the negative declaration, and declare the SEQRA procedures "incomplete”.
There is no such provision in the law, either SEQRA or the Town Law, and to imply that such an action is appropriate *354 after a hearing for approval of the final plat is ludicrous. It would place every developer in the grasp of a vacillating public body which could not withstand the "heat” of public outcry.
Least it be misunderstood that this court is now saying that the Planning Board is without a "remedy” by which it may act, that is not so. The Town Law, pursuant to which it is bound to act in a lawful manner, provides that "escape valve.” The Town Law which describes the parameters of Planning Board action does not say that the Planning Board must "take effective action” as claimed by respondents. The Town Law § 276 requires that the Planning Board take 1 of 4 specified and defined actions. This Planning Board defaulted in that regard.
Whether the reasons are as stated by respondents in their brief, i.e., that new significant information was in fact revealed at the public hearing of February 19, 1986, or as claimed by petitioner, that the Town Board, in reacting to the outcry of village residents at the public meeting of the Planning Board was attempting to delay action until it could institute a rezoning procedure to "frustrate” petitioner, is of little moment.
This court finds that the attempted rescission by the respondent Planning Board did not constitute "action” as contemplated by the controlling statute (Town Law § 276) and the 45 days expired without appropriate action being taken as required by the statute. Thus a default occurred and petitioners are entitled to the relief they seek at this time.
On April 16, 1986, the Planning Board, after public hearing held on February 19, 1986, passed a resolution which states in pertinent part:
"RESOLVED, that based upon the comments generated by the hearing on the question of final approval of the proposed subdivision and the recommendations of the Planning Department for further study of traffic impacts, the negative declaration previously issued by this Board is hereby rescinded, and be it further
"RESOLVED, that the time within which to act on the application for the final approval for the proposed subdivision is hereby extended for 45 days from the date of this resolution for good cause pursuant to the requirements of State Environmental Review Act in order to allow this Board to explore the issues raised in the course of the public hearing make a determination pursuant to S.E.Q.R.A. as to whether the pro *355 posed project may have a significant adverse impact to the environment.”
Let us examine the extension which the Planning Board attempted to grant itself. This was enacted unilaterally without the consent of the owner. This is clearly in violation of the pertinent section of the Town Law (i.e., § 276 [4]). As previously stated, there can be no question that, absent some SEQRA requirement, petitioner is entitled to the approval certificate because default statutes have been uniformly construed to require automatic approval upon the failure to act within the prescribed time limits (Matter of Sun Beach Real Estate Dev. Corp. v Anderson, 98 AD2d 367, 369, supra). Other than traffic concerns, respondents raised no objections to petitioners’ application for final approval and therefore the court must conclude that all other meaningful elements of petitioners’ application were satisfactory.
There is little question but that if the Planning Board had required the filing of a draft environmental impact statement by the petitioner at the very outset of these proceedings, this case might be very similar to the issues raised by the court in both Sun Beach and Glen Head (supra), imposing a continuing obligation on respondent to consider environmental factors and perhaps require a supplemental environmental impact statement before approval of a final plat.
However, this is not so in the case at bar. The Planning Board, after reviewing certain "concerns” as indicated in its memo of May 15, 1985, and receiving firm commitments in response thereto, including the inclusion of the "tap” street, then gave notice of a public hearing in which it clearly indicated to anyone who read the notice that a negative declaration was to be issued. The public hearing was conducted, notice was given to other public agencies and the negative declaration was issued. Certain regulations have been adopted pursuant to SEQRA to guide the various agencies in the proper, implementation of the statute. Of particular relevance to this case are 6 NYCRR 617.1 (b), (c); 617.10 (b); 617.11, all of which the Planning Board complied with before issuing the negative declaration.
Since no environmental impact statement was required by the Planning Board (the Board having issued a negative declaration) unless there is some other SEQRA consideration, the petitioners would be entitled to the approval certificate by reason of the Planning Board’s default.
*356 The Appellate Division in Glen Head (supra) stated that the "lead agency” has an ongoing obligation of review of the EIS, and could in an appropriate case require an applicant to provide a supplemental environmental impact statement. This court must provide a balance, however, between the guidance of the court in the Glen Head case and the import of a decision by a lead agency not to timely require a draft environmental impact statement.
As Justice Lazer commented in Sun Beach (supra) "SEQRA’s procedures are intended to minimize to the greatest degree possible the adverse environmental consequences of any project that is approved. * * * 'As early as possible in the SEQRA process, the agency "having principal responsibility for carrying out or approving” a given project * * * must determine whether an Environmental Impact Statement (EIS) should be prepared with reference to the proposal submitted’ ” (Matter of Sun Beach Real Estate Dev. Corp. v Anderson, supra, at 370). In both Glen Head (supra) and Sun Beach such a positive decision was made. In the case at bar, however, the "lead agency” made a determination of nonsignificance based upon a determination that the proposed project will not have a "significant impact on the environment.” The lead agency made no secret of its intentions in this regard. As noted above, it published a notice for a public meeting and informed other concerned agencies. Only after the public hearing was the negative declaration issued. This permitted the petitioners and respondents as well as other interested parties to comply with the legislative intent "that environmental factors be given consideration '[a]s early as possible in the formulation of a proposal for an action’ * * * The emphasis on early consideration facilitates the underlying purposes of a [draft environmental impact statement] DEIS — 'to relate environmental considerations to the inception of the planning process, to inform the public and other public agencies as early as possible about proposed actions that may significantly affect the quality of the environment’ * * * If the DEIS is not prepared at an early stage, modification of a project in light of subsequently discovered environmental problems may be difficult because nonenvironmental considerations may have already been transformed into an over-all proposal” (Matter of Sun Beach Real Estate Dev. Corp. v Anderson, supra, at 371).
Factually, a draft EIS (DEIS) was considered by the lead agency and the need therefore denied as the agency recommended to the public and other interested agencies that a *357 negative declaration or determination of nonsignificance be issued. As the Appellate Division stated in Sun Beach (supra, at 372-373, 375-376):
"We view preliminary plat approval as so significant a determination during the process that an environmental impact statement must be deemed a prerequisite to the approval. The two-stage subdivision approval procedure — preliminary approval and final approval — adopted in this State in 1966 (Town Law, § 276, subds 3, 4, as amd by L 1966, ch 695) was intended to fix the broad outlines of the proposed development so that the developer could know where it stood before incurring additional expenses associated with the preparation of the detailed plans involved in final approval * * * Once preliminary approval has been granted, the final plat implements the design determinations made at the earlier stage and shows the project in greater detail.
"Preliminary plat approval has greater weight than a mere informal reaction to a preliminary plat * * * and it has been held that a planning board may not modify a preliminary plat and then disapprove of the layout of a final plat that conforms to the modifications prescribed by the board * * * It has even been held that, absent new information, a subsequent modification or rejection of a preliminarily approved subdivision layout is an arbitrary and capricious act subject to invalidation * * * Preliminary plat procedures and default provisions would lack significance if they were subject to nullification as the result of mere change of heart by the planning body. * * *
"Depending on whether significant new information is revealed in the final plat submission, the agency may require the filing of a supplemental DEIS * * *
"It is apparent that SEQRA’s drafters did not take into account some of the idiosyncracies of subdivision procedures * * * and it has been left to the judiciary to attempt to coordinate the statutes * * * We have no difficulty in according priority to SEQRA because the legislative declaration of purpose in that statute makes it obvious that protection of 'the environment for the use and enjoyment of this and all future generations’ * * * far overshadows the rights of developers to obtain prompt action on their proposals. Once SEQRA’s priority is recognized, the statute must be read to mandate that a preliminary plat application is not complete until a DEIS has either been dispensed with or accepted and the 45-day limitation in the Town Law does not commence to run until the application is complete”.
*358 It would appear to this court after having reviewed all of the foregoing, the Planning Board in pursuance of its court-imposed continuing obligation of review, must either call for a further, be it final or supplemental environmental impact statement, or perhaps as should have been done in this case disapprove the final plat, with appropriate rational reasons justifying its actions. This Planning Board had followed the spirit as well as the language of ECL article 8 (SEQRA) until the last moment, when at the public hearing in February 1986, there was a public outcry regarding alleged traffic problems. Whether this was a "red herring” or a meaningful objection is not for this court in this proceeding to determine. If the Planning Board was of the opinion that these objections constituted "new, significant information” the Planning Board had several choices.
Those choices are statutory.
Town Law § 276 states:
(a) conditional approval,
(b) conditional approval with or without modification,
(c) disapproval,
(d) grant final approval.
There are no other statutorily authorized actions. The Planning Board, being a creature of legislative enactment, is not free to alter the choices. This Planning Board attempted to avoid making a legislatively mandated decision. In so doing, it did not act within the statute. Its ultra vires actions are, therefore, nullities. This cannot now be defended by respondents as an "act” which this court must recognize as having occurred within the statutory framework.
It is noted that, pursuant to a comprehensive revision of the State-wide regulations which implement SEQRA, a lead agency is now empowered to rescind a negative declaration (6 NYCRR 617.6 [i]). The new regulations became effective on June 1, 1987, but were initially circulated in January of 1986. The court concludes, however, that had the new regulations been in effect when the Planning Board acted, annulment of its rescission of the negative declaration would still be warranted, if the rescission were challenged within 30 days.
The new regulation provides: "(i) Rescission of negative declarations. At any time prior to its decision to undertake, fund or approve an action, a lead agency must rescind a negative declaration if it determines that a significant environmental effect may result from a project modification or *359 that there exists a change of circumstances which was not previously addressed. Prior to any rescission, the lead agency must inform other involved agencies and the applicant and must provide a reasonable opportunity for the applicant to respond.” (6 NYCRR 617.6 [i].)
In the matter sub judice, the only project modifications were made at the behest of the Planning Board. Furthermore, no "change of circumstances occurred” and the traffic issue which most concerned those who attended the hearing and which the Planning Board based its rescission on was addressed early in the approval process. Additionally, most of the traffic studies which the Planning Board asserts justified the rescission had been available for years. Lastly, petitioners received neither notice of nor an opportunity to respond to the proposed rescission. Thus, the Planning Board did not follow the procedural mandates of the new regulation. Though rescission was not authorized prior to June 1, 1987, if the new regulation had been in effect, petitioners would have been required to challenge an "action” authorized either by 6 NYCRR part 617 or section 276 of the Town Law based upon the Planning Board’s rationale or the procedure employed rather than on the Planning Board’s default as in this proceeding.
Not only was rescission of a negative declaration unauthorized by statute and the regulations in existence prior to June 1, 1987, but the Planning Board’s change of position also transgressed the finality doctrine which prohibits an administrative body from reviewing its own determinations (see, e.g., Felner v Shapiro, 94 AD2d 317; Tenant’s Comm. of 40 E. 78th St. v Abrams, NYLJ, Mar. 4, 1987, at 6, col 5).
In view of the court’s determination, consideration of whether the Planning Board was bound by its self-imposed 45-day time limit for further action is unnecessary.
Based on the foregoing, this court has no alternative but to annul the Planning Board’s rescission of its negative declaration and to conclude that the statutory time (Town Law § 276 [4]) has expired. The Planning Board has failed to take a legally authorized action on a final plat within the time prescribed therefor, the plat shall be deemed approved. A certificate of the clerk of the town as to the date of submission and the failure to take action within such prescribed time shall be issued on demand and shall be sufficient in lieu of written endorsement or other evidence of approval herein required.
*360 In view of the disposition of this proceeding, the preliminary injunction previously issued by this court shall continue pending resolution of petitioners’ plenary action (action No. 2), on condition that the $20,000 undertaking be maintained.
Any party to said plenary action may seek a conference before the Justice currently assigned to the case.