LAZARD REALTY, INC., Petitioner, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Respondent.

Supreme Court, New York County, January 18, 1989

### APPEARANCES OF COUNSEL

*Stein, Davidoff, Malito & Teitle* for petitioner. *Dewey, Ballentine, Bushby, Palmer & Wood* and *Berle, Kass & Case* for respondent.

### OPINION OF THE COURT

STANLEY PARNESS, J.

Petitioner in this CPLR article 78 proceeding challenges the approval by respondent, the New York State Urban Development Corporation (UDC), of an amendment (the Amendment)

to the Project Plan (the Plan) for the 42nd Street Development Project (the Project).

Petitioner, Lazard Realty, Inc., is the developer of the International Design Center of New York (IDCNY), an interior furnishings mart in Long Island City, Queens. Petitioner's application challenges the Amendment insofar as it is a modification of the originally approved land use for Site No. 8 (Site 8) of the Project whereby the site would not be limited to use as a wholesale computer and apparel mart, but could include all wholesale merchandise or an interior furnishings mart or, if a mart use proved infeasible, other uses could be substituted. Alleging that the modification is an independent "action" within the meaning of the New York State Environmental Quality Review Act (ECL 8-0101 *et seq.* [SEQRA hereinafter]), petitioner asserts that respondent's approval of the modifications on February 9, 1988 must be annulled on the ground that respondent failed to comply with the procedural and substantive requirements of SEQRA and its implementing regulations, 6 NYCRR part 617, 617.1 *et seq.* Specifically, petitioner asserts that pursuant to SEQRA the Site 8 modification warrants a de novo review by UDC, requiring a new environmental impact statement (EIS) rather than the procedure followed by respondent which contemplated a supplemental EIS (SEIS). Petitioner urges that possibly adverse effects on IDCNY of an interior furnishings mart at Site 8, and adverse ripple effects on Long Island City, as well as the pertinent traffic analysis, at the site were only superficially addressed therein and never subjected to the requisite "hard look" by UDC.

Respondent, UDC, created by the New York State Urban Development Corporation Act (McKinney's Uncons Laws of NY § 6251 *et seq.* [UDC Act hereinafter]) to carry out the State's policy "to promote * * * the correction of * * * substandard, insanitary, blighted, deteriorated or deteriorating conditions * * * by the clearance, replanning, reconstruction, redevelopment, rehabilitation, restoration or conservation of such areas" (UDC Act § 6252), is empowered to "do any and all things necessary or convenient to carry out its purposes and exercise the powers given and granted in this act." (UDC Act § 6255 [28].)

A complete account of the history and background of the Project is given in *Matter of Jackson v New York State Urban Dev. Corp.* (67 NY2d 400). Briefly, the Project to revitalize the Times Square area of Manhattan had its formal inception

more than eight years ago with the execution by UDC and the city, on June 27, 1980, of a memorandum of understanding to collaborate in rehabilitating the area through the use of private developers. In February 1981, UDC and the city issued a document identifying, among the Project's goals, elimination of blight, revitalization of the area as an entertainment center, and development of commercial potential. Six months later UDC adapted a proposed general project plan and made findings as required by the UDC Act, including that the area was, or was in danger of becoming, substandard and insanitary and tended to impair or arrest the sound growth and development of the city. UDC took the appropriate and necessary steps in furtherance of the plan, held the first public hearings on the plan pursuant to the UDC Act and the Eminent Domain Procedure Law (EDPL) and received written and oral comments from the public.

In undertaking the Project, UDC was required to comply not only with the UDC Act but also with SEQRA, EDPL and the State Historic Preservation Act. Under SEQRA, UDC as the designated lead agency for the Project was required to prepare an EIS concerning the Project's anticipated environmental effects.

Planning continued and in February 1984, with the cooperation and participation of the city, UDC issued its draft EIS (the DEIS). The environmental review process pursuant to SEQRA, the UDC Act and EDPL continued with extensive public hearings, review and analysis, revisions, and the issuance of a final EIS (the FEIS) modifying the DEIS and responding to the comments the DEIS had elicited. Thereafter UDC received further comment on the Project and the FEIS and held another hearing pursuant to EDPL. In October 1984 UDC approved the Plan together with a series of findings. The New York City Board of Estimate held further public hearings and on November 9, 1984 unanimously approved the Project, expressly stating in its resolution that it concurred in and adopted the findings made by UDC. The Project terms approved were virtually identical to those approved by UDC, except that the Board of Estimate permitted a broader range of uses for the Site 8 mart.

Considerable litigation challenging the Project followed its approval. Of those challenges, four article 78 proceedings decided by the Court of Appeals in *Jackson v New York State Urban Dev. Corp. (supra)* alleged violations by UDC of SEQRA and EDPL challenging, *inter alia,* the adequacy of the FEIS

analysis of traffic and air quality impacts, archaeological impacts, effects on the city water supply, gentrification impacts on the poor and elderly in the Clinton neighborhood adjacent to the Project, and the adequacy of the mitigation measures identified and recommended by UDC to reduce or eliminate the Project's environmental impacts. Of particular relevance herein was the challenge in those proceedings to UDC's determination not to prepare a supplemental EIS in connection with certain post-FEIS changes to the Plan. As to those modifications which involved Site 7, UDC's staff and consultants had concluded from the analyses made that the modifications would not have significant environmental impacts. UDC had then determined that the modifications would not be environmentally significant and had decided not to issue an SEIS. *Jackson* upheld UDC's compliance with SEQRA in all respects, determining that it had taken the requisite "hard look" at the Project's environmental consequences and also approved UDC's procedure with respect to the post-FEIS modification.

Since the Amendment was adopted, this application and several additional proceedings and actions have been commenced, challenging UDC action on various grounds including, *inter alia,* noncompliance with SEQRA, the UDC Act and EDPL.

The modifications constituting the Amendment were proposed on August 20, 1987 by Vincent Tese, chairman of the Board and chief executive officer of UDC, by memorandum with attachments to the directors of UDC *(see,* Record of proceedings of the Feb. 9, 1988 action in connection with the Project, submitted with this application pursuant to CPLR 7804 [the Record hereinafter], at 1354-1430).

The memorandum and Amendment attached thereto proposed the following modifications: (1) changes to Sites 1, 3, 4 and 12 in the number of parking spaces resulting in a net increase of 50 spaces, and certain adjustments to sidewalk widths; (2) to Site 8, solely as to the use and change of use of the building to conform to the Board of Estimate resolution, a change permitting a merchandise mart without restriction as to wholesale industry mix and also to permit conversion from mart to another use subject to certain conditions; and (3) permitting sequential property acquisition commencing with sites that are ready to be developed, with acquisition of the remaining sites to follow to complete the Project Plan (Record, at 1354-1359), as opposed to simultaneous taking of all sites.

The memorandum requested that the directors adopt the Amendment subject to final affirmation as provided in the UDC Act, authorize the holding of public hearings pursuant to the UDC Act and recommended approval of the requested action, but indicated that an environmental assessment consistent with SEQRA would be completed. It emphasized that although no environmental effects were expected as a result of the modifications, final affirmation of the proposed Amendment would await and be subject to completion of the environmental assessment and compliance with all requirements of SEQRA (Record, at 1355).

The public hearing pursuant to the UDC Act on the Amendment as adopted was held on September 30, 1987, with Judge Arthur Markewich presiding as Hearing Officer. More than 60 speakers appeared at the hearing, including representatives of petitioners *(see,* Record, at 1546-1551, 1706-1710, 1771-1777). In addition, UDC received numerous written submissions including comments from petitioner's counsel *(see,* Record, at 2121-2128). UDC prepared an environmental assessment of the proposed modifications comparing the impacts of the Project as proposed to be modified with the impacts of the Project as approved (Record, at 2157). In making these comparisons, the environmental assessment adjusted the date of completion to 1994, since the FEIS analysis assumed a 1991 completion date for the Project and, in part as a result of delays attributed to litigation, the Project is now expected to be completed in 1994 *(id.).* A draft of the environmental assessment was made available at the time of the hearing and a final version was presented to the directors at the February 9, 1988 meeting. The environmental assessment analyzed, *inter alia,* the effects of the broader range of mart uses permitted by the Amendment and specifically considered both a mart for general wholesale uses and a mart predominantly for the interior furnishings industry. Because the Amendment would also permit a change from a mart use to offices, the effects of office conversion were also considered. The environmental assessment concluded that the proposed modifications and revisions would have no significant environmental impacts either individually or cumulatively and that, "[a]ccordingly, the environmental impacts of the Project, after giving effect to such proposed Amendment and revisions, will not differ materially from those already set forth in the FEIS." (Record, at 2180.)

After consideration of the environmental assessment and other documentation the directors of UDC, on February 9,

1988, by unanimous resolution (1) modified the Amendment in accordance with the materials presented at the meeting; (2) for the reasons stated in the environmental assessment and other materials presented, determined that in accordance with SEQRA the Amendment will not have a significant effect on the environment and that a supplemental EIS need not be prepared; (3) affirmed the Amendment; and (4) authorized execution of the initial Project leases. (Record, at 1472-1474.) This proceeding as well as other proceedings and actions followed UDC's declaration as to the Amendment and its affirmation.

The petition alleges that IDCNY was developed with the support of the city's Public Development Corporation as a premier showplace for the wholesale interior design industry, that approximately $182,000,000, including Federal Government and city funds as well as sums invested by banking institutions and by petitioner, has been invested in IDCNY's development, in addition to which the city's Industrial and Commercial Incentive Board approved a 19-year partial tax abatement to facilitate IDCNY's development, and that IDCNY has had a profound effect on the economic matrix of the city's furniture industry and has helped to generate the economic revitalization of Long Island City. The petition then invokes one of SEQRA's purposes, "to promote efforts which will * * * enhance human and community resources" (SEQRA 8-0101) and one of SEQRA's mandates that "[s]ocial, economic, and environmental factors shall be considered together in reaching decisions" (SEQRA 8-0103 [7]), and the regulations (6 NYCRR 617.1 *et seq.*) which also emphasize the importance of considering all factors. Relying on these mandates, petitioner urges, in substance, that instead of identifying the relevant areas of environmental concern, taking a "hard look" at them and rendering a reasoned elaboration of the basis of its declaration of environmental nonsignificance, UDC prepared a document which mimics a DEIS in scope and volume, by means of which it avoided controversy and the testing ground of public review contemplated by SEQRA, but which is superficial and fails to examine, analyze and disclose the feasibility and consequences of developing an interior furnishings mart, which may put IDCNY at a competitive disadvantage and may by a "ripple effect" adversely affect the development of Long Island City.

Petitioner also alleges that the traffic analyses are superficial and were made without attention to the consequences of

changed truck routes. The petition also claims that UDC failed to comply with SEQRA and its procedural regulations in that an EIS is required whenever there is a possibility of significant environmental effect; that literal compliance with SEQRA is required, not substantial compliance; that UDC did not prepare a preliminary environmental assessment form (EAF) as required by 6 NYCRR 617.5 (a) (5) to determine if the proposed action created a possibility of significant impact; and that the agency must evaluate whether the proposed change is significant, in the first instance, as an independent action pursuant to 6 NYCRR 617.2 (b) (1) (i) in determining whether a negative declaration should be made.

In its answer UDC denies the material allegations of the petition and asserts as affirmative defenses that the petition fails to state a cause of action, that petitioner has no standing to bring this proceeding; that UDC complied fully with SEQRA and that UDC did not exceed its jurisdiction and its determination was neither arbitrary and capricious, nor an abuse of discretion.

The standards applicable to judicial review of a determination made pursuant to SEQRA are those applicable to administrative proceedings generally, i.e., whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion (Matter of Jackson v New York State Urban Dev. Corp., supra, 67 NY2d, at 416). It is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency has satisfied SEQRA procedurally and substantively (supra). In challenging the Amendment on procedural grounds petitioner claims, inter alia, that this is a case of first impression in that it brings up for judicial review the issue of an agency's obligations pursuant to SEQRA when it affirms an amendment after it has adopted and filed a findings statement certifying that it has given consideration to the FEIS and that the requirements of 6 NYCRR part 617 have been met. In support of this contention petitioner relies on 6 NYCRR 617.2 (b) (1) (i), (iii) and 617.8 (g) (1) (i) which provide:

"617.2 Definitions. As used in this Part, unless the context otherwise requires: * * *

"(b) Actions include:

"(1) projects or physical activities, such as construction or other activities that may affect the environment by changing

the use, appearance or condition of any natural resource or structure, that:

"(i) are directly undertaken by an agency; or * * *

"(iii) require one or more new or modified approvals from an agency or agencies".

"617.8 Environmental impact statement procedures. * * *

"(g) *Supplemental EIS's.* (1) Prior to the filing of a findings statement, the lead agency may require a supplemental EIS, limited to specific issues not addressed or inadequately addressed in the EIS, in the following circumstances:

"(i) changes are proposed for the project which may result in a significant adverse environmental effect".

Pointing out that UDC had already filed a findings statement when the subject Amendment was proposed, petitioner argues that 6 NYCRR 617.8 (g), the only section of part 617 solely dedicated to SEIS's, is not applicable here and the Amendment falls squarely under the definition of an action under 6 NYCRR 617.2 (b). In further support of this argument petitioner emphasizes the passage of time of almost 3½ years between the conclusion of the FEIS process, including the findings statement, and the proposal of the Amendment. Petitioner reasons that in this procedural posture the Amendment is an action pursuant to 6 NYCRR 617.2 (b) requiring a de novo environmental review rather than the comparative review used, which had also been used with respect to an earlier amendment adopted in 1984 and approved in *Jackson (supra)*.

While it does appear that the procedural issue framed by petitioner has not been reviewed by the courts, it is not as genuine an issue under SEQRA and 6 NYCRR part 617 as petitioner would make it appear. Section 617.8 (g) of 6 NYCRR part 617, containing the prefatory language regarding supplementation prior to making findings, was added to part 617 in the course of a major revision adopted by the New York State Department of Environmental Conservation on March 6, 1987 and effective June 1, 1987. The revision included the adoption of section 617.20, which provides that part 617 as revised applies to actions for which a determination of significance has not been made prior to June 1, 1987, and that actions for which a determination of significance has been made prior to June 1, 1987 shall comply with part 617 as adopted on September 1, 1978. UDC's determination of significance for the Project was made on January 27, 1984, well before the

effective date of the revisions including section 617.8 (g). Thus the language in section 617.8 (g) relied on by petitioner is not applicable to the Project, and the regulations as adopted September 1, 1978 do not contain similar language. Nor does SEQRA itself or any case law support petitioner's interpretation of the regulations. However, even if the revised regulations are deemed applicable to the Project, petitioner's arguments, relying on isolated passages of part 617 as revised, are unavailing.

As UDC asserts, the Project plainly is an action that consists of a series of steps from planning to operation, as described in 6 NYCRR 617.3 (k) (a section added in the 1987 revision which contains almost identical language to former § 617.2 [b] [4], defining an "action" prior to the 1987 revisions) and is thus subject to section 617.3 (k) (2) which provides as follows:

"(k) Actions commonly consist of a set of activities or steps *(e.g.,* for capital projects the activities may include planning, design, contracting, demolition, construction and operation). The entire set of activities or steps shall be considered the action, whether the agency decisionmaking relates to the action as a whole or to only a part of it. * * *

"(2) If it is determined that an EIS is necessary, *only one draft and one final EIS need be prepared on the action* if the statement addresses each part of the action at a level of detail sufficient for an adequate analysis of environmental effects. Except for a supplement to a generic environmental impact statement (see section 617.15 of this Part), *a supplement to a draft or final EIS will only be required in the circumstances prescribed in section 617.8 (g) of this Part.*" (Emphasis added.)

The DEIS and FEIS for the Project were prepared in 1984 in the course of UDC's exhaustive (and, in *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, *supra,* judicially approved) environmental review of the Project. The Amendment involves a partial change in the use of one site that is an integral part of the much larger Project involving 12 sites. Thus the Amendment is simply a later step in implementing the Project, and in considering whether or not to approve it, UDC prepared an assessment to determine whether the Amendment required preparation of an SEIS and concluded that it did not.

Nor does the passage of time require that the Amendment be treated as an independent action, detached from the Proj-

ect and requiring de novo environmental review. " '[T]he mere passage of time rarely warrants an order to update the information to be considered by an agency' " *(Matter of Jackson v New York State Urban Dev. Corp., supra,* 67 NY2d, at 425, citing *Sierra Club v United States Army Corps of Engrs.,* 701 F2d 1011, 1036). Indeed, *Jackson* emphasizes that a requirement of constant updating would render the administrative process endless with litigants demanding rehearings with each new circumstance, trend or fact *(supra).*

Sections other than section 617.8 (g) of 6 NYCRR part 617, which refer to modifications and SEIS's and deal with aspects of the environmental review process other than those specified in section 617.8 (g) (1), such as section 617.3 (k) and parts of the section dealing with generic EIS's, section 617.15, may be examined to shed additional light on procedures regarding changes. The reference to section 617.8 (g) made in section 617.3 (k) (2) appears to be for purposes of defining the factual circumstances in which an SEIS must be made—e.g., when changes are proposed which may result in a significant adverse environmental effect (§ 617.8 [g] [1] [i]), not, as petitioner contends, to set the procedural time frame in which it is to be considered—i.e., "[p]rior to the filing of a findings statement" (§ 617.2 [g] [1]). Both sections 617.3 (k) and 617.15 invoke section 617.8 (g) as a guideline for SEIS's but both of those sections encompass situations in which findings could have been made and filed. In any event, if under any of the sections the agency would determine, upon making an environmental assessment, that a proposed modification may have a significant adverse effect on the environment an SEIS would be required under SEQRA, 6 NYCRR part 617 and decisional law. Thus, it does not appear, upon reading and interpreting the appropriate sections of 6 NYCRR part 617 as revised together, that they were intended to bar a postfinding Amendment from being treated as a modification rather than an action. The court finds this interpretation appropriate and adopts it because it harmonizes and gives proper effect to these sections and is consistent with case law under SEQRA *(see, Matter of Jackson v New York State Urban Dev. Corp., supra,* 67 NY2d, at 429-430) and under the National Environmental Policy Act, upon which SEQRA is modeled *(see, e.g., State of Wisconsin v Weinberger,* 745 F2d 412, 416-418 [7th Cir 1984]; *Sierra Club v United States Army Corps of Engrs.,* 701 F2d 1011, 1034-1036, *supra* [2d Cir 1983]; *Environmental Defense Fund v Marsh,* 651 F2d 983, 989, n 5 [5th Cir 1981]).

However, even if the Amendment were to be treated as an independent action, the review would employ the same method; the analysis of existing conditions (or the "no action" alternative) would start with the Project as approved, not from no Project at all. This is so because in proposing the Amendment, UDC did not abandon the Project as originally approved. Thus if the Amendment were treated as a separate action, the environmental review would analyze the environmental impacts of the Project with the proposed changes and compare those impacts with the impacts of the Project without the proposed changes. This is the procedure used by UDC when it did the environmental assessment and concluded that the proposed Amendment would have no significant environmental impacts. In this respect the environmental review was procedurally proper and clearly not in violation of law.

Other procedural challenges by petitioner are that UDC failed to prepare an environmental assessment form (EAF) pursuant to 6 NYCRR 617.2 (m) "to assist it in determining the environmental significance or nonsignificance" (§ 617.2 [m]) of the Amendment, that the environmental assessment (EA) prepared by UDC somehow was intended to circumvent public participation and that the EA relied on outdated methodologies. Section 617.2 (m) provides that an EAF is required with respect to an action and that the model short and long forms provided in appendices A and C of 6 NYCRR 617.21 may be modified by an agency "provided the scope of the modified form is as comprehensive as the model" (§ 617.2 [m]). The EAF requirement does not apply to a determination of significance in relation to a supplemental EIS; the forms are explicitly referred to in section 617.2 (m) as applicable to an initial determination of significance for an action, which here would be the Project. Even if the forms were applicable, the EA does more than cover the applicable issues raised in the model forms. The allegation that by using its EA, UDC circumvented public participation is without merit since, pursuant to SEQRA, the threshold determination of environmental significance to determine whether an EIS is required for either an independent action or a modification does not require public participation (*Matter of Jackson v New York State Urban Dev. Corp., supra,* 67 NY2d, at 429-430). However, although not required to do so, UDC did make a draft of its EA available to the public and invited public comment on the proposed Amendment.

Nor is there a genuine issue as to out-of-date methodologies.

In its models and analyses for traffic and air quality, for example, which is one of the specific areas on which the EA is challenged by petitioner, the EA utilized the most recent programs developed by the United States Environmental Protection Agency as well as recent field surveys *(see,* Record, at 2175-2176).

On these papers it is clear that UDC's procedures satisfied SEQRA and 6 NYCRR part 617, and petitioner's procedural challenge of UDC's determination that the Amendment would not have a significant environmental impact is without merit.

Petitioner's substantive challenges of UDC's environmental review relate to the use of the Site 8 mart for an interior furnishings mart. Petitioner alleges that UDC failed to consider the feasibility of the use of the mart site for interior furnishings, the effects of the possible failure of IDCNY on Long Island City or all of Queens, and the potential traffic impacts of the change in mart use.

In responding to the issue of feasibility, Carl Weisbrod, the president of the 42nd Street Development Project, Inc., a subsidiary of UDC, persuasively asserts that the best indication of feasibility would be the willingness of a private developer to commit significant resources to develop such a mart. The mart operator with whom UDC has been negotiating is Joseph P. Kennedy Enterprises (Record, at 2349, 2355-2356), the Nation's premier mart operator, Weisbrod asserts, who constructed and for many years operated the Chicago Merchandise Mart and is highly knowledgeable as to industry trends. This developer appears to have a high degree of confidence in the success of such a mart since its investment therein would involve very substantial commitments of funds, personnel and inventory. Moreover, UDC was advised in a thorough and extensive memorandum by James Felt Realty Services, a major New York real estate firm, that an interior furnishings mart within the Project has strong prospects for success (Record, at 2342-2347). In addition, the EA considered and reviewed alternative uses such as offices, for which it has received assurances of developer interest (Record, at 2179, 2348-2365). Thus, petitioner's challenge as to consideration of the feasibility issue is without merit.

The allegation that UDC failed to adequately consider the effects of the possible adverse impact on IDCNY, on Long Island City and on Queens generally is also without merit. Part II-A, "Off-site Impacts" and appendix B, "Potential Off-

site Land Use Effects of an Interior Furnishings Mart", both parts of the EA (Record, at 2158-2159, 2185-2213) as well as an intensive, thorough study, "Analysis of Economic Conditions in the Interior Furnishings Industry with a Furniture Mart in the 42nd Street Development Project", prepared by Allee King Rosen & Fleming, Inc., dated January 1988 (Record, at 2273-2341) and the James Felt Realty Services memorandum, "Real Estate Perspective on Inclusion of New Interior Furnishings Mart in 42nd Street Project" (Record, at 2342-2347), submitted with the EA to the directors, thoroughly addressed, examined in depth and analyzed the current locations of the wholesale interior furnishings industry in the city, including, in lengthy detail and with particular attention, IDCNY and Long Island City, and considered the possible impacts of a locational shift away from those locations as a result of the inclusion of an interior furnishings mart at Site 8. The results and conclusions after review and analysis, as set forth in appendix B of the EA, were that such locational shifts in the industry would not have significant impacts on land use, community character or population patterns in any of these locations; and that if the Project's interior furnishings mart were to induce such locational shifts away from these districts, replacement uses, particularly office uses, would be both feasible and compatible with surrounding areas. In Long Island City, in particular, the EA found that catalytic effects of IDCNY had been minor, that it functioned as a largely self-contained structure with few established links to other properties, and that other development is proceeding in Long Island City, as well as in Queens as a whole, independently of IDCNY (see, Record, at 2158-2159, 2203-2208, 2212-2213).

In addition, although economic effects are not environmental impacts in themselves, they were addressed in the EA. SEQRA requires an agency to assess environmental impacts, and defines environment as follows: "6. 'Environment' means the physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character." (ECL 8-0105 [6].)

Thus economic effects may be environmental impacts only if they have an impact on one of the factors in the definition, such as population patterns or existing community character (see, Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 366). The potential impact of the Amendment on

economic conditions was analyzed, primarily because the industries involved are important to the city's economy and any potential for change was a relevant consideration in the decision to approve the Project in 1984, and because the decline or expansion of these industries could affect the character—and therefore the environment—of the surrounding communities. The EA followed the procedures of the FEIS even though no impacts on land use and community character were identified as a result of the proposed Amendment (Record, at 2161-2166). Further analyses were made as well to provide additional economic considerations to UDC's directors.

There is no need for the court to relate in greater depth and detail the full extent of the EA's examination of possible adverse effects of the Amendment on IDCNY and the ripple effects that petitioner alleges would follow therefrom. It is clear that UDC identified these issues, studied them in depth and detail, and presented a thorough, reasoned basis for its determination as to this issue.

The same may be said for the traffic impact analysis, which specifically considers the three separate scenarios for the mart site (Record, at 2169-2172), (1) a general wholesale merchandise mart with 1.7 million square feet of showroom space and 460,000 square feet of office space, 285,000 square feet of retail space and a 131,000-square-foot health club; (2) a wholesale mart for interior furnishings with 1.3 to 1.7 million square feet of showroom space, 460,000 to 840,000 square feet of office space, and the retail space and health club as in scenario 1; and (3) office use of the mart site. The detailed traffic analysis *(see,* Record, at 2166-2175, *and* appendices C-G, at 2214-2272) as well as the air quality review incorporate recent improvements in EIS modeling techniques and new traffic generation rates for the new Project uses proposed in the Amendment. The manifold aspects of traffic patterns and conditions which modify them are carefully identified with respect to the proposed Site 8 use modifications, and then equally carefully analyzed.

To support UDC's negative declaration as to the Amendment "the record must show that it identified the relevant areas of environmental concern, took a 'hard look' at them *(Kleppe v Sierra Club,* 427 US 390, 410, n 21; *Maryland-National Capital Park & Planning Comm. v United States Postal Serv.,* 487 F2d 1029, 1040) and made a 'reasoned elaboration' of the basis for its determination *(City of Rochester v United States Postal Serv.,* 541 F2d 967, 973)."

*(H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222, 232; *see also, Matter of Jackson v New York State Urban Dev. Corp., supra,* 67 NY2d, at 417; *Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484, 492).

Literal compliance with the environmental review procedures set forth in SEQRA and the regulations is required *(Aldrich v Pattison,* 107 AD2d 258, 264; *Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, supra,* 88 AD2d, at 490-491), and the threshold at which the requirement that an EIS be prepared is relatively low; it need only be demonstrated that the action may have a significant effect on the environment *(Chinese Staff & Workers Assn. v City of New York, supra,* 68 NY2d, at 364-365). However, the "hard look" standard does not authorize the court to conduct a detailed de novo analysis of every environmental impact reviewed and analyzed by the agency *(Aldrich v Pattison, supra,* 107 AD2d, at 267).

The substantive challenges raised by the petition have been adequately shown on these papers, including the Record, to be without merit. There can be no doubt that UDC identified the relevant areas of environmental concern, subjected them to the requisite "hard look", and produced a reasoned elaboration of the basis for its determination that the proposed modifications will not result in any significant environmental effects. Petitioner's reply memorandum and its accompanying affidavit of petitioner's counsel and affidavits by five individuals with expertise in, respectively, environmental studies, air quality analysis, furniture mart development and management, mart development in general, and the furniture industry in general, offer other conclusions than those of UDC. The affidavits deal with the economics of interior furnishings marts, general merchandise marts, the furniture industry and, using limited factual material, speculate as to adverse economic impacts if the Amendment's interior furnishings mart scenario comes to fruition. The affidavits fail to acknowledge the extensive analyses on this issue on which UDC relied.

Respondent questions the propriety of the traffic impact affidavit submitted by Morton Orentlicher (Orentlicher), whose area of expertise is air quality analysis and who is a former deputy director with the New York City Department of Environmental Protection, alleging it may have run afoul of a section of the conflicts of interest provision of the New York

City Charter (§ 2604 [h]). Whatever the conflict, if any, it does not affect the relevance and admissibility of the affidavit where the issue is whether UDC complied with the substantive requirements of SEQRA and the regulations in making the determination challenged herein. The Orentlicher affidavit asserts, in substance, that the EA was flawed in that its projections were based on out-of-date data, which led to underestimates of future traffic volumes. However, as respondent points out, the EA accounted and compensated for changes and developments since the preparation of the FEIS *(see,* Record, at 2168).

In essence, all five affidavits disagree with UDC's analyses and conclusions and by identifying areas of disagreement, reinforce the perception that UDC did indeed identify the relevant areas of environmental concern.

Petitioner's other arguments made in support of the petition have been reviewed by the court and found to be without merit.

As stated in *Jackson (supra,* at 417): "[I]n a case such as this, courts may, first, review the agency procedures to determine whether they were lawful. Second, we may review the record to determine whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination *(Aldrich v Pattison,* 107 AD2d 258, 265, *supra; Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 491, *affd* 60 NY2d 805, *supra; H.O.M.E.S. v New York State Urban Dev. Corp.,* 69 AD2d 222). Court review, while supervisory only, insures that the agencies will honor their mandate regarding environmental protection by complying strictly with prescribed procedures and giving reasoned consideration to all pertinent issues revealed in the process."

However: "Nothing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency's choice, which can be annulled only if arbitrary, capricious or unsupported by substantial evidence *(Aldrich v Pattison,* 107 AD2d 258, 267, *supra; see also, Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council,* 435 US 519, 555)." *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 417.)

Upon review of the petition and the papers submitted herein this court has found UDC's determination to have been made in conformance with the law and to be neither arbitrary and capricious, an abuse of discretion nor unsupported by substantial evidence. Accordingly, petitioner's application is denied and the petition is dismissed.